# EXHIBIT 1

1

CASE NO. **C-24-381730-A**

IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP
COUNTY OF CLARK, STATE OF NEVADA

THE STATE OF NEVADA,      )
    Plaintiff,            )
vs.                       ) CASE NO. **23CR013015**
JOSE DECASTRO,            )
    Defendant.            )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ANN E. ZIMMERMAN
JUSTICE OF THE PEACE
TUESDAY, MARCH 19, 2024
9:30 A.M.

APPEARANCES:
For the State:
    A. BOTELHO, ESQ.
    B. MCKAY, ESQ.
    DEPUTY DISTRICT ATTORNEYS

For the Defendant:
    M. MEE, ESQ.
    ATTORNEY AT LAW

Reported by:   CHRISTA BROKA, CCR. No. 574

---

2
INDEX

| WITNESS | PAGE |
|---|---|
| **BRANDON BOURQUE** | |
| Direct Examination by Ms. Botelho | 8 |
| Cross-Examination by Mr. Mee | 28 |
| | |
| **JOSE DECASTRO** | |
| Direct Examination by Mr. Mee | 47 |

| EXHIBITS | ADMITTED |
|---|---|
| State's Exhibit 1 - | 22 |
0022

---

3
Electronically Filed
4/22/2024 2:59 PM
Steven D. Grierson
CLERK OF THE COURT

LAS VEGAS, CLARK COUNTY, NEVADA,
MARCH 19, 2024 AT 9:30 A.M.

P R O C E E D I N G S

THE COURT:  Jose Decastro, 23CR013015.

MS. BOTELHO:  Good morning, Your Honor. Agnes Botelho and Blake McKay for the record for the State.

THE COURT:  Good morning.

MR. MEE:  Good morning.  Michael Mee on behalf of the Defendant who is present with me this morning.

THE COURT:  So I have signed two media requests that permit recording or photographing these proceedings.  I have not granted any other request to record or live stream these proceedings.  So I need Mr. Decastro and everybody else who wants to stay in the courtroom to surrender their phones or you can leave.  I need Mr. Decastro to empty all of his pockets.

THE DEFENDANT:  What's that?

THE COURT:  Empty your pockets.

THE MARSHALL:  Empty your pockets and give up your phones.

THE DEFENDANT:  I have to give you my

---

4

phones?

THE COURT:  Yep.

THE DEFENDANT:  My phones have to be completely off?

THE COURT:  Yep.  I don't really want to be part of your You Tube channel.

THE DEFENDANT:  You already are.

THE COURT:  Great.

THE DEFENDANT:  You already are.

THE COURT:  Awesome.

THE DEFENDANT:  I'm not going to give them to this guy though.

THE COURT:  No.  They're going to go to my marshall.

THE DEFENDANT:  He's a pig.

THE COURT:  Excuse me?

THE DEFENDANT:  I said he's a pig.

THE COURT:  Okay.  Sir, I'm not going to permit you to speak to anybody in my courtroom in that manner.  If you don't want to apologize, I'm going to hold you in contempt.

THE DEFENDANT:  I apologize to the Court, Your Honor.

THE COURT:  No.  You can apologize -- they've done nothing to you.

5

1  THE DEFENDANT: Actually Your Honor, when
2  you weren't here he came over and gave me a directive
3  for no reason and start telling me what to do.
4  THE COURT: Okay.
5  THE DEFENDANT: I have all the respect in
6  the world for the Court. I follow the rule of law all
7  the time.
8  THE COURT: No. It is their job to maintain
9  the safety and security of the courtroom.
10  THE DEFENDANT: I agree with you, Your
11  Honor.
12  THE COURT: So if you want to speak like
13  that in my courtroom, I'm going to hold you in contempt.
14  If I hold you in contempt, you're going to jail. That
15  is not my wish. Okay?
16  THE DEFENDANT: Not my wish either.
17  THE COURT: So I need you to empty your
18  pockets too. Suit pocket. Pants pocket.
19  THE DEFENDANT: This is illegal. This is a
20  violation of my Fourth Amendment.
21  THE COURT: No, it isn't.
22  THE DEFENDANT: Yes, it is. I don't have
23  any recording devices on me. What are you talking
24  about?
25  THE COURT: What about your suit jacket?

6

1  THE DEFENDANT: I don't have anything on me.
2  This is preposterous.
3  THE COURT: No, it's not.
4  THE DEFENDANT: It really is.
5  THE COURT: No, it's not.
6  THE DEFENDANT: Yes, it is.
7  THE COURT: Mr. Mee, your phone too. Off.
8  THE DEFENDANT: They are recording
9  everything.
10  THE COURT: They have a media request.
11  THE DEFENDANT: Your guy took my phone. His
12  phone is not on. You're going to take the lawyer's
13  phone too?
14  THE COURT: No, I'm not going to take your
15  lawyer's phone. He's an officer of the court. All
16  right. Do we have everybody's phones? Are they off?
17  All right. Good.
18  This is the time set for the trial of State
19  of Nevada versus Jose Decastro, 23CR013105. Is the
20  State ready to proceed?
21  MS. BOTELHO: Yes we are, Your Honor.
22  THE COURT: How many witnesses do you have?
23  MS. BOTELHO: We anticipate one.
24  THE COURT: Is the Defense ready to proceed?
25  MR. MEE: Yes, Your Honor.

7

1  THE COURT: I have your request to convert
2  counsel to standby counsel. I am going deny that
3  request. Either you represent him or he should have
4  previously should have requested a Faretta canvas to
5  represent himself. That I just consider that a delay
6  tactic so that request is denied. Are you ready to
7  proceed otherwise, I am assuming you are?
8  MR. MEE: Yes, Your Honor.
9  THE COURT: State please call their first
10  witness.
11  MS. BOTELHO: The State calls Branden
12  Borque.
13  THE COURT: Good morning.
14  THE MARSHALL: Please remain standing and
15  raise your right hand to be sworn by the clerk.
16  THE CLERK: Do you solemnly swear to tell
17  the truth, the whole truth, and nothing but the truth?
18  THE WITNESS: I do.
19  THE CLERK: Please be seated. State your
20  name for the record and spell it first and last name
21  please.
22  THE WITNESS: It's Branden Borque. Branden
23  is B-R-A-N-D-E-N. Bourque, B-O-U-R-Q-U-E.
24  THE COURT: Please go ahead.
25  MS. BOTELHO: Thank you.

8

1  DIRECT EXAMINATION
2  BY MS. BOTELHO:
3  Q. Sir, good morning.
4  A. **Good morning, ma'am.**
5  Q. Sir, how are you employed?
6  A. **I'm a police officer with the Las Vegas Metropolitan Police Department.**
7
8  Q. How long have you been employed with Metro?
9  A. **Just over eight years.**
10  Q. What is your like -- what's your occupation there
11  like where are you assigned?
12  A. **I'm currently a field training officer at Summerlin Area Command.**
13
14  Q. Are you a patrol officer?
15  A. **Yes, ma'am.**
16  Q. That also trains newer officers?
17  A. **Yes.**
18  Q. Were you employed with Metro, I'm assuming you
19  are because you've been employed for eight years, back
20  on March 15th of 2023?
21  A. **Yes, I was.**
22  Q. Were you a patrol officer at that time?
23  A. **Yes, I was.**
24  Q. As a patrol do you wear a uniform?
25  A. **Yes, I do.**

**Page 9**

1  Q. Can you describe the uniform.
2  A. **It would be the same uniform I'm wearing today.**
3  Q. For the record you are wearing a tan uniform with
4  the logos Las Vegas Metropolitan Police Department
5  located throughout your shirt?
6  A. **Yes.**
7  Q. As a patrol officer do you have access to or
8  utilize a marked patrol vehicle?
9  A. **Yes.**
10 Q. Can you describe what this marked patrol vehicle
11 looks like?
12 A. **It's black and white in color and it was LVMPD's**
13 **logo on all sides.**
14 Q. Is it also equipped with lights and sirens?
15 A. **Yes.**
16 Q. So you were employed as a patrol officer back on
17 March 15th of 2023?
18 A. **Yes.**
19 Q. At some point in time did you conduct a traffic
20 stop while you were working in that capacity?
21 A. **Yes, I did.**
22 Q. On that date?
23 A. **Yes.**
24 Q. And was that for a vehicle bearing license plate
25 748 Z, like zebra, T like Tom, B like boy?

**Page 10**

1  A. **Yes.**
2  Q. And what -- why did you stop that vehicle?
3  A. **I had conducted a DMV records check on that**
4  **license plate and it came back expired and suspended.**
5  Q. Where is it that you stopped this vehicle?
6  A. **It was 4155 South Grand Canyon which was near**
7  **Target.**
8  Q. Is that over on Flamingo and Grand Canyon?
9  A. **Yes.**
10 Q. And that's here in Las Vegas, Clark County,
11 Nevada, sir?
12 A. **Yes.**
13 Q. And you indicated it was for a license plate that
14 was expired and suspended?
15 A. **Yes.**
16 Q. When you initiated the traffic stop what did you
17 do or how did you do that?
18 A. **I approached the driver. Let her know the reason**
19 **for the stop and obtained her identifying information,**
20 **registration and insurance.**
21 Q. Okay. I forgot to ask you earlier pursuant to
22 your uniform and as a patrol officer are you equipped
23 with a body worn camera?
24 A. **Yes, I am.**
25 Q. And do you also have a radio?

**Page 11**

1  A. **Yes, I do.**
2  Q. Are those items both the body worn camera and the
3  radio on your uniform today?
4  A. **Yes, they are.**
5  Q. Is that how the body worn camera and/or the radio
6  were on your uniform back on March 15th of 2023?
7  A. **Yes.**
8  Q. To your knowledge was your body worn camera
9  functioning at that time?
10 A. **Yes, it was functioning.**
11 Q. And so you made contact with the driver of that
12 Hyundai?
13 A. **Yes, I did.**
14 Q. How would you characterize the nature of your
15 encounter or the -- yeah, the nature of your encounter
16 with that driver?
17 A. **She was cooperative with me. I explained the**
18 **reason for the stop. She seemed confused. Not sure**
19 **exactly it had how become suspended but she was friendly**
20 **and cooperative.**
21 Q. Okay. And she identified herself?
22 A. **She did. She had a picture of her license on her**
23 **phone.**
24 Q. Okay. At some point, sir, did you go back to
25 your patrol vehicle to further your investigation?

**Page 12**

1  A. **I did.**
2  Q. As you were -- let me ask you this: When you
3  effectuated the traffic stop on this vehicle where did
4  you park or stop your vehicle in relation to the Hyundai
5  that you had stopped?
6  A. **I parked approximately ten, fifteen feet behind**
7  **the stopped vehicle. We ended up in the parking lot.**
8  Q. Okay. Was the driver the sole occupant of the
9  vehicle?
10 A. **Yes.**
11 Q. And so when you returned to your patrol vehicle
12 to conduct your further investigation was the driver
13 within eyesight?
14 A. **Yes, she was.**
15 Q. Is it your habit and custom and also your
16 training to keep an individual that you are dealing with
17 within eyesight?
18 A. **Yes.**
19 Q. And so at some point while you were still in your
20 vehicle, your patrol vehicle, did something occur that's
21 causing you to have to testify before Judge Zimmerman
22 today?
23 A. **Yes. I had an unrelated person come over and**
24 **start recording the traffic stop.**
25 Q. Okay. And we talked about body worn camera

13

1  previously but did you activate your body worn camera
2  prior to the traffic stop?
3     A.  **Yes, I did.**
4     Q.  Just before you initiated the traffic stop?
5     A.  **I initiated the stop and then I immediately**
6  **activated the camera.**
7     Q.  Okay. And how is it that body worn camera is
8  activated on your uniform, sir?
9     A.  **I have a battery pack that's on my belt in front**
10 **and I press the activation button which is in front.**
11    Q.  Okay. So it is just a tap of that activation
12 button?
13    A.  **It's a double tap on front, yes.**
14    Q.  Okay. And how is it that you would stop
15 recording?
16    A.  **I would hold down that same power button.**
17    Q.  Okay.
18    A.  **Or it can be turned off there's a toggle switch**
19 **on the top. It slides on and off.**
20    Q.  Okay. Your body worn camera was running as of,
21 you know, the stop the traffic stop?
22    A.  **Yes.**
23    Q.  Okay. And so you described an unrelated
24 individual coming over to your stop?
25    A.  **Yes.**

14

1     Q.  Can you describe this individual?
2     A.  **He was a white male adult. He was wearing a**
3  **bright colored hoodie and blue jeans.**
4     Q.  Okay. That individual do you see him here in
5  court today?
6     A.  **Yes.**
7     Q.  Could you please point to him and describe
8  something he's wearing.
9     A.  **He's wearing a suit and blue tie.**
10         MS. BOTELHO: Your Honor, please let the
11 record reflect identification of the Defendant.
12         THE COURT: So ordered.
13 BY MS. BOTELHO:
14    Q.  And so what do you do upon seeing this individual
15 approach the driver of the vehicle you had stopped?
16    A.  **Initially when I saw him he was just recording, I**
17 **ignored him and continued my records check. Then when**
18 **he came over to the driver and started speaking with**
19 **them I got out of the car, approached the driver, and**
20 **told Decastro to back up.**
21    Q.  When you first noticed -- you identified the
22 unknown or unrelated related male subsequently; correct?
23    A.  **Yes.**
24    Q.  What was his name?
25    A.  **Jose Decastro.**

15

1     Q.  And that's the individual you identified here in
2  court?
3     A.  **Yes.**
4     Q.  When you first laid eyes on the Defendant
5  approximately how far away was he from the driver of the
6  vehicle in the Hyundai?
7     A.  **Approximately somewhere within five to ten feet.**
8     Q.  Okay. And you indicated that he was recording?
9     A.  **Yes.**
10    Q.  What did you see that lead you to believe he was
11 recording?
12    A.  **He had his cellphone camera pointed directly at**
13 **me.**
14    Q.  So is that when upon seeing him being that close
15 to the driver is that when you told him -- you walked up
16 to the driver of the stopped vehicle and asked
17 Mr. Decastro to back up?
18    A.  **Yes. Once he started talking to the driver.**
19    Q.  Okay. And why is it that you did that, Officer?
20    A.  **Well, I can't have unrelated people next to my**
21 **traffic stops. I don't know if he's a dangerous person,**
22 **armed. He could be the boyfriend of the stopped person.**
23 **It's for my safety and the safety of the person I**
24 **stopped.**
25    Q.  Because you're also in charge of the safety of

16

1  the individual that this unrelated individual's making
2  contact with; is that fair to say?
3     A.  **Yes.**
4     Q.  And you saw it as an officer's safety issue as
5  well as a safety issue for the driver?
6     A.  **Yes.**
7     Q.  And so when you approached -- you said he was
8  recording, the Defendant was recording, at any time did
9  you tell him to stop recording?
10    A.  **No. In fact I told him he could continue**
11 **recording.**
12    Q.  He can continue to record given what?
13    A.  **I said as long as he backed up and gave me the**
14 **appropriate distance to work.**
15    Q.  When you asked the Defendant to back up did he
16 follow your order?
17    A.  **No, he did not.**
18    Q.  So what did you do next?
19    A.  **I gave him three additional warnings to back up.**
20    Q.  Okay. Did he obey those orders?
21    A.  **No, he did not.**
22    Q.  What, if anything, did you do with the driver of
23 the stopped vehicle the Hyundai?
24    A.  **At that point I chose to release the driver of**
25 **the Hyundai and then focus my attention on Jose**

17

1 Decastro.
2   Q.  Okay.  For the record, Officer, at that point in
3 time were you the only uniformed officer, the only
4 officer present at the scene?
5   A.  Yes, ma'am.
6   Q.  So at this point you were dealing with a stopped
7 driver as well as an unrelated individual and having to
8 make contact -- or maintain visual of both?
9   A.  Yes.
10  Q.  And at that point the Defendant was not being
11 cooperative?
12  A.  Correct, yes.
13  Q.  Okay.  So you release the driver of the Hyundai.
14 What do you tell that person to let her go?
15  A.  I just said that she was free to go.
16  Q.  And subsequently did you turn your attention on
17 the Defendant?
18  A.  Yes.
19  Q.  Can you tell Judge Zimmerman the nature of your
20 interactions with Defendant after that.
21  A.  I ordered Decastro to the front of my patrol
22 vehicle pointing at it and told him he was detained.
23  Q.  What was the purpose of detaining him?
24  A.  For obstructing my initial traffic stop with the
25 Hyundai.

18

1   Q.  And did he obey your lawful order?
2   A.  No, he did not.
3   Q.  And what happened next?
4   A.  He continued filming me.  I continued pointing
5 toward my patrol vehicle.  Continued telling him he was
6 detained.  All the while he just continued shifting his
7 body around recording me on the phone and refused to go
8 to the car.
9   Q.  Okay.  What did you do in response?
10  A.  I use my hand to escort him to the patrol
11 vehicle.  So I placed my hand on his shoulder and at
12 that point he swatted my hand away.
13  Q.  What happened next?
14  A.  That's when I grabbed him by the shirt and I spun
15 him around and we ended up at the front of my patrol
16 vehicle.  Both still standing.
17  Q.  At some point did you request additional units to
18 respond to the scene?
19  A.  I did.  That was before I grabbed him.
20  Q.  Okay.
21  A.  When I initially detained him.
22  Q.  Once you had him at your patrol vehicle the front
23 the hood of your patrol vehicle what happened next?
24  A.  Officer Dingle another officer in the area that
25 arrived.  He came over to help me handcuff him.

19

1   Q.  And were you successful or did the Defendant
2 cooperate in being handcuffed?
3   A.  He did not cooperate.  I told him seven times to
4 face my patrol vehicle.  He did not listen.  I told him
5 six times to turn around.  He did not listen.  It wasn't
6 until I told him that he was going to do to jail that
7 was the consequence of not listening that allowed us to
8 handcuff him.
9   Q.  After he was handcuffed -- when he was handcuffed
10 was it just you and Officer Dingle present?
11  A.  Yes.
12  Q.  Once he was handcuffed what, if anything,
13 happened next?
14  A.  He continued to argue with my partners Officer
15 Dingle and other officers that were starting to show up.
16 Then I focussed my role in completing the report and
17 calling the sergeant because he requested a supervisor.
18  Q.  Okay.  At some point was he arrested for a count
19 of obstructing a public officer?
20  A.  Yes.
21  Q.  And also for resisting a public officer or
22 resisting arrest?
23  A.  Yes.
24  Q.  At any point in time during your interaction with
25 him or your continued visual interaction with other

20

1 officers did he cooperate with any of the officers
2 present at the scene?
3   A.  No.  He kept shifting around and normally we have
4 people stand still in front of our car.  I did hear him
5 arguing with the other officers.
6   Q.  You indicated you had your body worn camera
7 turned on at this time?
8   A.  Yes.
9   Q.  Did you have an opportunity to look at your body
10 worn camera prior to court today?
11  A.  Yes, I did.
12      MS. BOTELHO:  We are going to be screen
13 sharing through Zoom.
14 BY MS. BOTELHO:
15  Q.  Officer, are you able to see?  There's not a
16 screen over there so I might have to bring mine over to
17 you with the Court's permission.
18      THE COURT:  Okay.
19 BY MS. BOTELHO:
20  Q.  Okay.  Officer, I'm showing you my computer
21 screen.  Is it fair to say that what's being shared on
22 screen as well as what's showing up on my computer
23 screen is are two files, one labelled 416B.MP4.  The
24 other one labelled 468#1.MP4?
25  A.  Yes.

21

1   MS. BOTELHO:  For the record, Your Honor,
2 all body worn camera footage have been disclosed to the
3 Defense well in advance of today's trial.
4 BY MS. BOTELHO:
5   Q.  I am going to show you a brief snippet of the one
6 labelled 468_#1.MP4.  Do you recognize what's depicted
7 here?
8   A.  **Yes.  This is the initial Hyundai that I had**
9 **stopped.**
10  Q.  Okay.  Do you recognize this particular file as
11 the body worn camera of your interaction first with the
12 Hyundai and then with the Defendant on March 15th of
13 2023?
14  A.  Yes.
15  Q.  And does this show the time that you activated
16 your camera?
17  A.  Yes.
18  Q.  Similar to what you testified to earlier?
19  A.  Yes.
20  Q.  You've had an opportunity to see this entire
21 twelve and a half minute long video; is that right?
22  A.  Yes.
23  Q.  Does it fairly and accurately depict the traffic
24 stop and also your interaction with the Defendant on the
25 date and time we've been discussing?

22

1   A.  Yes.
2   Q.  At the location we've been discussing?
3   A.  Yes.
4       MS. BOTELHO:  Your Honor, I'd move to admit
5 and subsequently publish 468_#1.MP4.
6       THE COURT:  Defense?
7       MR. MEE:  No objection.
8       THE COURT:  It will be admitted and
9 published.
10      MS. BOTELHO:  Thank you.
11         (Playing video.)
12 BY MS. BOTELHO:
13  Q.  I'm pausing at timestamp nine minutes and sixteen
14 seconds.  At this point, Officer, do you see the
15 unrelated male that you've been talking about enter
16 camera view?
17  A.  **Yes, I do.**
18  Q.  Could you point to where he is in the video on my
19 screen.
20  A.  **Yes.  Right here.**
21      MS. BOTELHO:  Let the record reflect he
22 identified a male wearing a light-colored blue jacket
23 towards the middle of the screen.
24 BY MS. BOTELHO:
25  Q.  And is this the individual that you've been

23

1 talking about the Defendant here today?
2   A.  Yes.
3   Q.  I'll continue.  Officer, at 1138 or a little bit
4 before another officer comes on screen.  Who is that?
5   A.  **Officer Dingle.**
6   Q.  Okay.
7         (Playing video.)
8       MS. BOTELHO:  That concludes the twelve
9 minute twenty-one second video marked 468_#1.MP4.
10 BY MS. BOTELHO:
11  Q.  Officer, at some point after this interaction
12 that we just saw did you come to realize that your body
13 worn camera had accidently or inadvertently turned off?
14  A.  Yes.
15  Q.  At what point in time did it turn off?
16  A.  **It would have turned off at the completion of the**
17 **video that we just saw prior to --**
18  Q.  Prior to what?
19  A.  **Prior to the handcuffing.**
20  Q.  Okay.  Did you at some -- we noticed that Officer
21 Dingle showed up to the scene though?
22  A.  Yes.
23  Q.  Okay.  And do you know whether he had has body
24 worn camera turned on?
25  A.  **Yes.  It was activated.**

24

1   Q.  Okay.  So what was -- what would have been missed
2 by the inadvertent turning off of your body worn camera
3 would have been captured on Officer Dingle's body worn
4 camera?
5   A.  Yes.
6   Q.  Okay.  Did I allow you to look at that video
7 footage from Officer Dingle this morning prior to
8 testifying here today?
9   A.  **Yes, you did.**
10  Q.  Did you have an opportunity to look at it to
11 determine whether it was in fact the video related to
12 this event?
13  A.  **Yes.  I looked at it and it was the video**
14 **related.**
15  Q.  So I'm turn your attention now to the video
16 labelled 416B.MP4. I'm just going to --
17      THE COURT:  Is it says 4168.
18      MS. BOTELHO:  I think it's 416B.MP4.
19      THE COURT:  Okay.
20      MS. BOTELHO:  Or 8.
21      THE COURT:  Okay.
22 BY MS. BOTELHO:
23  Q.  And I just played the first thirteen seconds but
24 actually I am going to fast forward.  For the record the
25 video is upside down, it recorded upside down?

25

1  A.  Yes, it did.
2        THE COURT:  Why would it record upside down?
3        THE WITNESS:  Ma'am, there's a setting in
4  the application where you can rotate it and this officer
5  may not have checked that beforehand.
6  BY MS. BOTELHO:
7     Q.  Stopping or starting at 454 timestamp on the
8  video that we've been talking about, do you recognize
9  what's depicted at least in this still portion?
10    A.  **Yes.  This is me and Decastro in front of my**
11 **patrol vehicle.**
12    Q.  So to your knowledge after having watched this
13 does this fairly and accurately depict your interaction
14 with the Defendant on March 15th of 2023 as caught on
15 camera by Officer Dingle's body worn camera?
16    A.  **Yes.**
17        MS. BOTELHO:  Move to admit 416B or 8.
18        THE COURT:  Defense?
19        MR. MEE:  No objection.
20        THE COURT:  Do you know if it's a B or 8 for
21 sure?
22        MR. MEE:  It looks like a B to me, Your
23 Honor.
24        MS. BOTELHO:  Thank you.
25        THE COURT:  Two out of three, I lose.  All

26

1  right.  416B.MP4 will be admitted and published.
2        MS. BOTELHO:  I'm going start at 454.  May I
3  approach, Your Honor?
4        THE DEFENDANT:  Can we move the water bottle
5  so we can see it too?
6        THE COURT:  Of course.
7        MS. BOTELHO:  You can come up.
8        (Playing video.)
9        THE DEFENDANT:  Can you tilt it?  I can't
10 see.
11        (Playing video.)
12        MS. BOTELHO:  I'm to going stop it at 1135.
13 BY MS. BOTELHO:
14    Q.  Officer, did the body worn camera portions that
15 we played or that I played fairly and accurately depict
16 your interaction with the Defendant on March 15th of
17 2023?
18    A.  **Yes, it did.**
19    Q.  Concerning -- I just want to talk a little bit
20 about what was depicted in the video.  In the video from
21 your body worn camera it shows, you know, the state of
22 your stop with the Hyundai driver.  Do you recall that?
23    A.  **Yes.**
24    Q.  At some point prior to you making contact with
25 the Defendant you noticed him kind of recording further

27

1  away from the vehicle; correct?
2     A.  **Yes.**
3     Q.  At that point in time you didn't have a problem
4  with that you didn't really approach the Defendant yet;
5  correct?
6     A.  **Correct.**
7     Q.  It was when he started making contact with the
8  driver, your stopped driver, that you approached him and
9  asked him to back up?
10    A.  **Yes.**
11    Q.  And at some point time in the video it's recorded
12 you told him that he is allowed to record but he just
13 needed to back up?
14    A.  **Yes.**
15    Q.  Okay.  And what was the reason for you trying to
16 maintain one, the lack no contact with the stopped
17 person and two, trying to gain distance between the
18 Defendant, yourself, and the stopped driver?
19    A.  **My first intention is I wasn't trying to delay my**
20 **traffic stop any longer than it had to be.  I was trying**
21 **to make it as short as possible for the driver.  The**
22 **second was for officer safety.  What we're taught in the**
23 **academy is that for a normal humans reaction time with**
24 **open ground anything within twenty-one feet that suspect**
25 **would be able to charge an officer without them being**

28

1  **able to react in time.**
2     Q.  And that point in time you were the only officer
3  present; correct?
4     A.  **Yes.**
5     Q.  Okay.  And when he began -- when the Defendant
6  failed to obey your command to back up that's when you
7  decide to engage him?
8     A.  **Yes.**
9        MS. BOTELHO:  Court's indulgence.  I have no
10 more questions for this witness.  Thank you.
11        THE COURT:  Defense?
12
13        CROSS-EXAMINATION
14 BY MR. MEE:
15    Q.  Good morning, Officer.  How are you today?
16    A.  **Good morning, sir.  I'm well.  How are you?**
17    Q.  Very well.  How many feet did you order the
18 Defendant to back up specifically?
19    A.  **I never had an opportunity to give him an exact**
20 **distance.**
21    Q.  How far back did you intend to have him back up
22 if you had expressed that?
23    A.  **In the background of the video you can see there**
24 **was a parked semi-truck and light pole I would have**
25 **directed him somewhere in that area which would have**

29

1 been outside the twenty-one feet.
2  Q. Your testimony is you never told him an exact
3 distance to back up; correct?
4  A. Yes. He never allowed me to.
5  Q. What do you mean never allowed you to?
6  A. I asked him to back up and he continued to argue
7 with me so I can never specify the exact distance for
8 him.
9  Q. But you had time to give him five commands to
10 back up; is that correct?
11  A. Yes.
12  Q. Your testimony is he never backed up when you
13 were giving him commands; is that correct?
14  A. If he backed up, it may have been inches but he
15 didn't substantially back up.
16  Q. You just reviewed the body worn camera from your
17 chest; is that correct?
18  A. Yes.
19  Q. You didn't notice him backing up every time you
20 directed him to back up?
21  A. He did not back up.
22  Q. So he backed up zero feet in your opinion?
23  A. Not zero feet.
24  Q. What was that?
25  A. He didn't back up zero feet. He was moving his

30

1 feet. As to exactly how far he moved back I don't know
2 but it wasn't substantial.
3  Q. What would have been substantial in your opinion?
4 What do you mean by that?
5  A. I would have guided him, if he wasn't arguing
6 with me, back towards the light pole and the parked
7 semi-truck which would have outside of twenty-one feet.
8 That was my goal.
9  Q. So in your opinion you have the ability or you
10 would at any traffic stop ask somebody to move back
11 twenty-one feet; is that correct?
12  A. Yes, per our training.
13  Q. And what was that training?
14  A. That while we're conducting lawful activity we
15 are allowed a reasonable distance to conduct our
16 activity.
17  Q. Where did you get that twenty-one feet number
18 from specifically?
19  A. That's taught to us in the academy. It's based
20 on reaction -- normal human reaction time to a threat.
21  Q. So your is position anytime you're engaging in
22 law enforcement activity you would create a
23 twenty-one feet perimeter?
24  A. Not necessarily. It depends on other
25 environmental factors such as obstacles and barriers.

31

1  Q. So your testimony is that every time you conduct
2 a traffic stop as long as there's no barriers you would
3 order a pedestrian to back up to twenty-one feet; is
4 that correct?
5  A. I would, yes.
6  Q. What training do you have in regards to the First
7 Amendment?
8  A. Standard academy training.
9  Q. Can you explain what that entails.
10  A. Usually includes a classroom setting power point
11 taught by the police officer academy officer.
12  Q. Do you remember receiving that training
13 specifically?
14  A. Yes.
15  Q. How long ago was that?
16  A. When I was first employed about eight years ago.
17  Q. Did you have any follow-up training?
18  A. Specifically on First Amendment we've had some
19 follow-up training regarding First Amendment auditors.
20  Q. Okay. Can you explain what that follow-up
21 training was.
22  A. The follow-up training was to -- just a refresher
23 on the First Amendment and how the department wants to
24 handle or react to First Amendment auditors.
25  Q. In that training did they explain any case law

32

1 governing how many feet somebody has to move back or
2 anything like that?
3  MS. BOTELHO: Objection, Your Honor. At
4 this point relevance. I think it is beyond the scope
5 of, you know, the charges you are to determine guilt at
6 this time.
7  THE COURT: Can you tell me what's the
8 relevance?
9  MR. MEE: Yes, Your Honor. He detained the
10 Defendant after issuing commands to back up a particular
11 distance. He's testified he received training. I
12 should be entitled to cross-examine him about what that
13 training is and how he's coming up with the specific
14 numbers he used.
15  THE COURT: I think her objection was with
16 respect to the case law that you're inquiring about.
17  MR. MEE: Your Honor, our position is that
18 he is issuing commands that are contrary to case law and
19 he has been trained on that case law but there can't be
20 an obstruction of justice.
21  THE COURT: So I'm going to sustain the
22 objection and ask that you move along.
23 BY MR. MEE:
24  Q. Have you had any prior issues enforcing the First
25 Amendment?

33

1   A.  No.
2   Q.  Prior to this event taking place had you heard of
3   Jose Decastro?
4   A.  No.
5   Q.  Do you recall when you first heard about First
6   Amendment auditors specifically?
7   A.  It would have been in the academy.
8   Q.  When you were first trained you had heard about
9   the auditors back then?
10  A.  Yes.  When we were learning about the First
11  Amendment they would typically bring up issues that
12  might be a frequently seen thing and the First Amendment
13  auditors are typically the ones that we encounter when
14  first when First Amendment claims against us.
15  Q.  Do you have any belief that First Amendment
16  auditors are likely to be violent?
17              MS. BOTELHO:  Objection.  Relevance.
18              THE COURT:  What's the relevance?  I am only
19  concerned with Mr. Decastro.
20              MR. MEE:  Your Honor, one of the legal
21  issues at question here is whether or not these commands
22  are reasonable.  I think that has to be based on his
23  past experiences in training.
24              THE COURT:  Sustained.
25  ///

34

1   BY MR. MEE:
2   Q.  During this traffic stop in particular what
3   specific factors lead you to believe there might be a
4   danger to officer safety?
5   A.  Based on his proximity to my driver.  Based on
6   his demeanor being argumentative.  Based on his physical
7   demeanor.  His veins were popping out of his neck as he
8   was yelling at me.
9   Q.  You can see his veins popping out of his neck
10  from back where your vehicle is?
11  A.  When I was at the driver's side window I could
12  see that but not at my car.
13  Q.  When you see him walking up from your car what is
14  your specific concern regarding officer safety at that
15  point in time?
16  A.  It's my safety and the safety of the driver.  I
17  don't know who this person is.  I've never met him
18  before.  He can be peaceful.  He can be violent.  I just
19  don't know.  There's so many unknown factors and I also
20  have a responsibility to protect that driver.  If I were
21  in that driver's position, I wouldn't want to be
22  approached by some random person recording me and
23  interviewing me.
24  Q.  Did you ever ask the driver of their opinion
25  about whether they wanted him there or not?

35

1   A.  No.
2              MS. BOTELHO:  Objection.  Relevance.
3              THE COURT:  Sustained.
4   BY MR. MEE:
5   Q.  Was your primary concern he was speaking to the
6   driver or him not backing up?
7   A.  My primary concern was safety.  I don't know if
8   he was armed or what his intention was.
9   Q.  Do you presume someone is armed and dangerous
10  just because they're in public?
11  A.  I can't rule out that he's unarmed.
12  Q.  But you had no reason to believe he was armed on
13  this particular occasion?
14  A.  No.  Nobody had told me he was armed and I didn't
15  see any weapons visible but he was wearing clothing that
16  could have easily concealed weapons.
17  Q.  When he first came upon the scene you were in
18  your vehicle typing on your computer; is that correct?
19  A.  Yes.
20  Q.  What were you doing in relation to that traffic
21  stop?
22  A.  Conducting a background to see if her license was
23  valid, to see if she had any criminal history to help
24  make a decision whether to warn her or issue a citation.
25  Q.  You stated your belief was that the driver was

36

1   entitled to privacy?
2   A.  I did say that.
3   Q.  What did you mean by that?
4   A.  Instead of continuing to give him commands to
5   back up, I said something different to try and help him
6   understand.  She's really not entitled to privacy but
7   she's entitled to safety.
8   Q.  So your explanation is that you said that because
9   you were trying to convince him to back up not because
10  you believed it?
11  A.  Yes.  If I continued to give the command to back
12  up and he's not listening, I can't expect something
13  different to happen if I just keep saying back up.
14  Q.  In your police report do you recall referencing
15  the fact that he had due notice in your opinion of what
16  you were commanding him to do?
17  A.  Yes.  When I gave him four commands to back up
18  that was due notice.
19  Q.  You'll agree with me that he did not have notice
20  as to the distance you wanted to him to back up; is that
21  correct?
22  A.  That's correct.
23  Q.  Approximately how long were you issuing these
24  commands before you decide to detain him?
25  A.  Approximately fifteen, twenty seconds.

37

1  Q.  And your testimony is you didn't have any time
2  during that back and forth to tell him a specific
3  distance to back up?
4  A.  **Not time but no opportunity.**
5  Q.  How so?
6  A.  **Well, every time I tried to speak with him he**
7  **would argue.  He wasn't listening at all.  So if he's**
8  **not understanding back up, how would you explain**
9  **something that was more complex?**
10 Q.  What was preventing you from saying back up to a
11 particular location?
12 A.  **First I would want him to back up and if he**
13 **didn't back up far enough, I would give him an exact**
14 **location.**
15 Q.  Okay.  But you never did; correct?
16 A.  **No.  I never did.**
17 Q.  Did the Defendant's verbal comments towards you
18 influence what you decided to do that day?
19 A.  **No.**
20 Q.  On the video did you see that point in time when
21 you decided to detain him was specifically after he made
22 an insulting comment towards you?
23 A.  **That wasn't why I choose to detain him.  I**
24 **realized that he wasn't going to back up at that time.**
25 Q.  His comments didn't make you angry at him?

38

1  A.  **No.**
2  Q.  In your review of the video just now he had both
3  hands in front of him the entire time; is that correct?
4  A.  **No.  At one point he reaches towards his back**
5  **pocket to pull out his second phone.**
6  Q.  Did you quickly see that it was a second phone he
7  was going for?
8  A.  **Yes.**
9  Q.  Once you see him produce a second phone in his
10 hands he's obviously not reaching for weapon; is that
11 correct?
12 A.  **At that time, no, he wasn't.**
13 Q.  What time of day did this occur at?
14 A.  **If I remember correctly 4:30 in the afternoon.**
15 Q.  This was in a broad public place?
16 A.  **Yes.**
17 Q.  Does the fact that this occurred in broad
18 daylight in a public influence your decision making as
19 far as issuing commands to the Defendant?
20 A.  **It could.  In this particular case it didn't.**
21 Q.  Why is that?
22 A.  **There was nobody around us other than me and the**
23 **driver and Decastro.**
24 Q.  You testified he swatted your hand away; is that
25 your testimony today?

39

1  A.  **Yes, that's the best way I can describe.**
2  Q.  You saw his arm do this or you just felt it?
3  A.  **I saw it and felt it.**
4  Q.  Do you recall in your police report stating that
5  you did not believe his intent was to harm you?
6  A.  **Yes.  I wrote that.**
7  Q.  What is your basis for reaching that conclusion?
8  A.  **He could have been charged for a battery on a**
9  **police officer which would have been more severe but I**
10 **didn't think his intent was to hurt me so I didn't**
11 **charge him with that.**
12 Q.  You testified today one of the things you were
13 concerned about was him not going over to your vehicle;
14 is that true?
15 A.  **Yes.**
16 Q.  Will you agree with me that he actually did walk
17 over to your vehicle at some point during the
18 interaction?
19 A.  **Yes but it wasn't reasonable the amount of time**
20 **it took him.**
21 Q.  What would be a reasonable amount of time?
22 A.  **Asking him to step in front of my car and him**
23 **doing so immediately.**
24 Q.  How fast is immediately?
25 A.  **This is isn't based off of time my response.**

40

1  **It's based off on the interaction.  I had to tell him he**
2  **was detained multiple times.  I made it clear what he**
3  **was detained for.  I said he was detained for**
4  **obstructing.  I gave him several commands to step in**
5  **front of my car.  I would think a reasonable person**
6  **would walk over to my car then we'd have a conversation**
7  **there.**
8  Q.  How specifically did his presence obstruct your
9  ability to complete the traffic stop?
10 A.  **Again I don't know what his intention is.  I**
11 **don't know if he's armed.  All I saw him was him**
12 **recording which again I had no issue with and I told him**
13 **I didn't have an issue with.  At some point in time if I**
14 **were to issue a citation to the driver my focus would be**
15 **on the driver and what's inside her car.  At that point**
16 **I hadn't pulled her out.  I hadn't pat her down.  I**
17 **don't know if she has any weapons in the car or what her**
18 **intent was if there was anything underlying.  My**
19 **intention on having Decastro back up was so that I**
20 **didn't have split attention.  It was too close for me to**
21 **have split attention.**
22 Q.  One of the things you stated you were concerned
23 about I guess for a safety point of view was that he
24 didn't identify himself; is that true?
25 A.  **No, I didn't care about his identity until I had**

0035

41

1  him detained.
2  Q.  Okay.  At any point during, I guess the detention
3  of the Defendant, did you pat him down to determine he
4  didn't have any weapons?
5  A.  I did.
6  Q.  Okay.  When was that during the duration of the
7  interaction?
8  A.  That was immediately after handcuffing.
9  Q.  Did you discover any weapons on him?
10  A.  No, I did not.
11  Q.  From your police car while he's walking up you
12  essentially have a complete view of his movements and
13  what he's doing at that point in time?
14  A.  Yes.
15  Q.  You never saw him during that time period before
16  you got out of your car reach for weapons or anything
17  like that?
18  A.  No.
19  Q.  Were there other individuals around the traffic
20  stop other than Defendant and the driver?
21  A.  Not that I can remember.
22  Q.  Do you recall anyone walking through the scene
23  and asking about the restaurant next door?
24  A.  I don't remember that.
25  Q.  But your testimony is if there was someone else

42

1  on video, you would have ordered that person to back up
2  twenty-one feet?
3  A.  I would have first asked them to back up and most
4  people do.  If they did not comply then I would give
5  them a specific area to back up to.
6  Q.  You ordered him not to speak to the driver; is
7  that correct?
8  A.  Yes.  Well -- I remember asking him to back up.
9  I don't remember if I remember specifically asked him
10  not to speak to the driver.  I think I might have said
11  don't talk to her or something to that effect.
12  Q.  Did he speak to her before you got out of your
13  patrol vehicle or afterwards?
14  A.  Before.  I saw Decastro filming.  I stayed in my
15  vehicle and continued my business.  Then when I saw him
16  speaking to the driver that's when I exited.
17  Q.  Did you see him speak to the driver after you
18  exited the vehicle at any point?
19  A.  I don't remember if he spoke to the driver after
20  I exited.
21  Q.  At any point did you hear specifically what he
22  may have said to the driver?
23  A.  No.  I was too far away and it was windy.
24  Q.  Is it your position that anytime you're engaged
25  in a traffic stop nobody can speak to the driver?

43

1  A.  They can speak to them at a reasonable distance.
2  Q.  Is that the twenty-one feet?
3  A.  It could be.  It could be shorter.  It could be
4  longer.  Again it depends on the environment.  The
5  totality of the circumstances.
6  Q.  Do you think people can easily verbally
7  communicate at twenty-one feet?
8  A.  No, not without shouting.
9  Q.  At some point the Defendant informed you that he
10  was a member of the press?
11  A.  He did.
12  Q.  Did that influence any of the orders you chose to
13  give or not give to the Defendant?
14  A.  No.  It doesn't matter.
15  Q.  Why does it not matter?  What is your basis of
16  that statement, I guess?
17  A.  Media reporters and standard citizens I treat
18  them all the same.
19  Q.  So you becoming aware that somebody is a member
20  of the press does not affect your decision making in
21  reference to your First Amendment training?
22  A.  No.  And how was I to know that was a member of
23  the press?  Whenever I interact with members of the
24  press they usually identify what station they're with or
25  group that they're with.  They usually have some sort of

44

1  identification badge and we have a good relationship
2  with press out here.  They don't approach us the way
3  that Decastro did.
4  Q.  Are you familiar with the difference between
5  traditional press and independent media?
6  A.  Yes.  But again independent media would approach
7  us more respectfully than Decastro.
8  Q.  Is your opinion that traditional media has
9  different rights than new media, independent media?
10     MS. BOTELHO:  Objection, Your Honor.  At
11  this point I think we are well beyond the scope.
12     THE COURT:  Sustained.
13     MS. BOTELHO:  Thank you.
14     MR. MEE:  Court's indulgence.
15  BY MR. MEE:
16  Q.  Your testimony is that, if I recall correctly,
17  that you received First Amendment training when you
18  initially went through your officer training?
19  A.  Yes.
20  Q.  And you received one follow-up after that?
21  A.  No.  It was more than one.  I don't know exactly
22  how many.  Typically that training is annual.
23  Q.  Your testimony just to reiterate this is the
24  first time you've experienced a First Amendment issue of
25  this nature in your career?

45

1  MS. BOTELHO: Objection. I believe I
2 objected to that question when it was posed as a violent
3 encounter. I also objected on the grounds of relevance.
4 As the Court indicated what we're concerned about is his
5 interaction with the Defendant specifically. So I
6 object.
7  THE COURT: Sustained. I'm only concerned
8 about this interaction.
9 BY MR. MEE:
10  Q. Do you recall during your interactions with the
11 Defendant that you told him that you believed First
12 Amendment auditors often pull out guns and shoot people?
13  **A. I didn't say that they often do that.**
14  Q. Do you recall what you said?
15  **A. I don't. I would have said he was a stranger to**
16 **me and that officers get ambushed all the time. It**
17 **could have been a First Amendment auditor. It could**
18 **have been a regular citizen. It could have been a cook**
19 **from one of the places nearby. I wouldn't have**
20 **specifically said that First Amendment auditors are a**
21 **higher risk.**
22  Q. Again just to reiterate your testimony is --
23  MS. BOTELHO: Objection. Anytime it's
24 prefaced as just to reiterate, I should object on asked
25 and answered grounds and I did not just to hear it but

46

1 just sounds like a reiteration of questions that have
2 been previously asked. So my objection is asked and
3 answered.
4  THE COURT: I am going let him ask the
5 question before I rule on your objection.
6 BY MR. MEE:
7  Q. Again I am trying to clarify because I think it's
8 ambiguous but do you recall the Defendant telling you he
9 was a member of the press during the interaction?
10  MS. BOTELHO: Asked and answered.
11  THE COURT: Sustained.
12  MR. MEE: No further questions, Your Honor.
13  THE COURT: Any redirect?
14  MS. BOTELHO: No. Thank you.
15  THE COURT: Thank you, Officer. You may
16 step down.
17  THE WITNESS: Thank you, Your Honor.
18  THE COURT: Does the State rest?
19  MS. BOTELHO: At this point we do.
20  THE COURT: Does the Defense have any
21 witnesses?
22  MR. MEE: Your Honor, I call Jose Decastro.
23  THE COURT: All right.
24  THE MARSHALL: Remain standing, raise your
25 right hand, and be sworn by the clerk.

47

1  THE CLERK: Do you solemnly swear to tell
2 the truth, the whole truth, and nothing but the truth?
3  THE DEFENDANT: Yes, I do.
4  THE CLERK: Be seated.
5  THE COURT: Mr. Decastro, before you testify
6 I'm obligated to inform you that you have the right to
7 testify in this proceeding but you also have the right
8 to remain silent and should you choose to remain silent
9 I may not hold that against you in making my decision.
10 Do you understand that?
11  THE DEFENDANT: I do.
12  THE COURT: Do you still wish to testify?
13  THE DEFENDANT: Yes, I do.
14  THE COURT: All right.
15
16          DIRECT EXAMINATION
17 BY MR. MEE:
18  Q. You own a You Tube channel?
19  **A. Yes, I do.**
20  Q. Can give us some insight into what that channel
21 is about?
22  MS. BOTELHO: Objection. Relevance.
23  THE COURT: What's the relevance?
24  MR. MEE: Your Honor, the relevance is that
25 we're presenting a First Amendment defense. The

48

1 Defendant is a member of the press. There's different
2 standards for First Amendment rulings where there's
3 public policy at issue. He can give you insight into
4 that.
5  THE COURT: I'm going to allow it for a bit
6 to see where it goes.
7  THE DEFENDANT: Yes, I do have a -- first, I
8 do have a You Tube channel. The reason I have a You
9 Tube channel is because how many cops kill people every
10 year. How many cops hurt, maim, torture, rape, and kill
11 people every single year. It's such an epidemic that
12 the rest of the world -- I get thousands of e-mails
13 saying only in America does this happen. I started
14 filming cops because when I was cheated in 2002 --
15  MS. BOTELHO: Objection, at this point.
16 Relevance. Narrative.
17  THE COURT: So can you ask him a question?
18  MR. MEE: Yes, Your Honor.
19 BY MR. MEE:
20  Q. What type of films do you make for your You Tube
21 channel?
22  **A. I only film police in their official capacity.**
23  **I'm known across the country and across the world.**
24  Q. Why do you engage in that type of filming?
25  MS. BOTELHO: Relevance.

**49**

1  THE COURT: I am asking you, Mr. Mee, to
2  direct the questions about the incident in question.
3  THE DEFENDANT: The reason I was filming --
4  MS. BOTELHO: Objection, Your Honor. There
5  wasn't a question.
6  BY MR. MEE:
7  Q.  Mr. Decastro, on the date in question why did you
8  approach that vehicle?
9  A.  **I was filming that cop because that's what I do**
10 **for a living. I am a member of the press. I invoked my**
11 **right to be press. I always invoke my right to be press**
12 **within that first ten seconds of engaging with police**
13 **and I have thousands of videos to prove this.**
14 THE COURT: So this is how you make money?
15 THE DEFENDANT: This is not how specifically
16 I make money. I make money from selling legal documents
17 to people.
18 BY MR. MEE:
19 Q.  Do you recall the Officer telling you to back up?
20 A.  **Yes, I do.**
21 Q.  What did you do after he told you to back up?
22 A.  **I took a couple steps back. I just showed him I**
23 **was willing to back up a little bit, however, if I may?**
24 **In Arizona --**
25 MS. BOTELHO: Objection. Relevance. We are

**50**

1  not in Arizona. It's the State of Nevada.
2  THE COURT: So I am going to allow it
3  because I think that goes to why he kept saying ten feet
4  in the video. Even though I will take judicial notice
5  that you're not in the State of Arizona. You are in the
6  State of Nevada.
7  THE DEFENDANT: A federal judge struck it
8  down, Your Honor. And --
9  THE COURT: Stop. Can you ask him a
10 question?
11 MR. MEE: Yes, Your Honor.
12 BY MR. MEE:
13 Q.  Approximately how many feet did you back up?
14 A.  **I backed up a foot or two. I was at least ten**
15 **feet away from the car that the driver was pulled over**
16 **in.**
17 Q.  When you spoke to the driver what did you say?
18 A.  **I asked her if she was okay. The reason I film**
19 **police is because they abuse people so often.**
20 Q.  Do you recall the Officer telling you not to
21 speak with the driver?
22 A.  **Yes.**
23 Q.  Did you make any statements to the driver after
24 this command was given?
25 A.  **Absolutely not.**

**51**

1  Q.  Did the Officer ever give you a specific distance
2  to back up to?
3  A.  **No. He didn't.**
4  Q.  If he did, would you have complied with that?
5  A.  **Sure.**
6  Q.  Did you believe you were complying with the
7  Officer's commands?
8  A.  **100 percent. I also informed him I was a member**
9  **of the press and a Constitutional law scholar this is**
10 **what I do.**
11 Q.  Do you recall the Officer explaining to you why
12 he decided to arrest you?
13 A.  **There's several parts to the reason why he said**
14 **he was going to arrest me because I wouldn't turn my**
15 **head a certain direction. If I didn't turn and face the**
16 **car with my head that he'd place me under arrest instead**
17 **of just giving me a ticket.**
18 Q.  Do you recall him explaining why he decided to
19 detain you before he arrested you?
20 A.  **He decided to detain me because he said I was**
21 **obstructing which from my understanding is a physical**
22 **act where I would have to get in the way. He said that**
23 **the driver deserved privacy. I believe my First**
24 **Amendment rights are not up for feelings.**
25 Q.  Did he explain to you that the basis of your

**52**

1  detention was related primarily to the issue of privacy
2  or the issue you of backing up?
3  A.  **Well, I think from the Officer's testimony we can**
4  **see he's scared of the driver, scared of me, scared of**
5  **everything. They teach them to be afraid of everything.**
6  **So I had two cameras out, identified as a member of the**
7  **press -- I'm sorry, repeat the question. I want to get**
8  **it specific for the record.**
9  Q.  Sure. The question was: Did the Officer explain
10 to you that the basis of your detention was you not
11 backing up or because of a privacy issue?
12 A.  **It was both. He said that -- he told me to back**
13 **up and I backed up a little bit. Then he said she**
14 **deserves privacy. Then I told him to go get in your car**
15 **little doggy and write your ticket. At that point his**
16 **face turned beat read and his veins in his neck stuck**
17 **out because we were over twenty feet away. You had to**
18 **holler to hear each other because the wind was 30 miles**
19 **an hour.**
20 Q.  Did you at anytime attempt to hit any officers
21 involved?
22 A.  **No. Absolutely not.**
23 Q.  Did you intentionally swat at any officers?
24 A.  **Absolutely not. He was giving me unlawful**
25 **commands. I should have not been detained after I**

0034

53

1  identified as a member of the press.  If he ever reached
2  a hand out towards me, I wrestle and teach MMA and I
3  have for 30 years so it's just a natural reaction when
4  retreating from somebody.  If I may have put my hand up
5  as he said as he testified himself, I certainly am a law
6  abiding citizen I don't break the law.  I would have not
7  tried to assault an officer under any circumstances.
8      Q.  Is it possible during the interaction there was
9  inadvertent contact?
10     A.  Sure.  He decided to go hands on with me when he
11 was giving me unlawful commands.  There was absolutely
12 no reason for it.  I was willing to comply with anything
13 he asked within reason because I don't want to have a
14 fist fight with another man on the street.
15     Q.  Do you recall the Officer ordering you to go to
16 his patrol vehicle?
17     A.  I do.
18     Q.  And what did you do in response to that?
19     A.  Initially I told him no.  But then when he began
20 to get physical with me and start to grab me and touch
21 me, I said okay I'll go over to your car.  His car was
22 35 feet away.  I then lead him to his car.  It's on
23 video you can see it.  I walked right up to his car and
24 he insisted still on grabbing me after he saw me pull
25 out an additional phone.  Which that's what press people

54

1  do, we have lots of cameras on us.
2      Q.  Did you inform the Officer that you were a member
3  of the press?
4      A.  Oh, several times.  It's in the transcripts.
5  I've transcribed them myself.  Several times I told him
6  I'm a member of the press.
7      Q.  Did you explain to the Officer that you have
8  background in Constitutional law?
9      A.  Yes.  I'm told him that I'm a Constitutional law
10 scholar which was a monicker given to me by other people
11 who are also -- they have their own channels their own
12 press and that's what some other lawyers on another
13 channel called me three years ago and I since adapted
14 the monicker.
15     Q.  Just to get some further background, were you
16 looking for police to record on this particular day?
17     A.  No.  The cops hide on the side of the road to
18 pull people over.  It's pretty regular in our country.
19 I was just in the parking lot there and I saw that
20 Mr. Bourque had somebody pulled over concerned for her
21 safety I began to film.
22     Q.  Why do you think law enforcement traffic stops
23 are relevant to the public?
24     A.  That's where most people get killed.
25         MS. BOTELHO:  Objection.  Relevance --

55

1         THE COURT:  Sustained --
2         MS. BOTELHO:  Move to strike.
3         THE COURT:  Sustained.
4         MR. MEE:  I'll pass the witness, Your Honor.
5         THE COURT:  State?
6         MS. BOTELHO:  I have no questions for this
7  witness.  Thank you.
8         THE COURT:  Thank you, sir.  You may step
9  down.  Does the Defense rest?
10        MR. MEE:  Yes, Your Honor.
11        THE COURT:  Any argument by the State?
12        MS. BOTELHO:  Your Honor, the State asks you
13 find the Defendant guilty of both the obstructing a
14 public officer as well as resisting a public officer
15 charged against him.  The video very adequately portrays
16 what the context was of the interaction with the
17 Officer.  I would venture to say had the Defendant just
18 complied with the original order to not engage with the
19 driver and to back up we wouldn't be here.  He wouldn't
20 have found himself further engaging Officer Bourque.
21 This is not a First Amendment issue.  As you heard over
22 and over and over again on the video Officer Bourque did
23 not have a problem with the Defendant recording.  It's
24 not a First Amendment issue, it's an officer safety
25 issue.  Here you have an officer who conducted a lawful

56

1  traffic stop.  You saw the nature of the stop.  There
2  was no animosity between the officer and the driver.  It
3  was rather peaceful and they engaged in banter back and
4  forth.  He would have as he testified he was trying to
5  determine whether he was going to cite her or let her go
6  with a warning.  Then you have an individual the
7  Defendant introduce himself into the situation.  Traffic
8  stops, Your Honor, are inherently dangerous particularly
9  in parking lots and I guess anywhere, you know, I would
10 venture to say.  This Officer was reasonable in thinking
11 that anyone who would approach in the manner that the
12 Defendant approached his scene would have a reason to
13 fear for his safety or at least be suspicious of this
14 individual's motives coming in.  The Officer had no
15 problem with him recording.  The Officer had no problem
16 with the Defendant observing.  It was when he inserted
17 himself into this lawful detention that was occurring
18 with the Hyundai driver that the Officer turned his
19 attention to the Defendant.  This is not a First
20 Amendment issue.  This is an individual who took his
21 what he perceived to be his rights too far.  The Officer
22 was well within his rights as well as acting reasonably
23 when he asked him to back up.  That twenty-one foot rule
24 it's appropriate.  He said that was the training that
25 they received in terms of the distance that's allowed

0035

57

1  for someone who means to do them harm.  It's a threat
2  assessment.  We don't know when the Defendant approached
3  whether he had a gun concealed, whether he had a knife
4  concealed, whether he had other weapons.  You'll hear
5  multiple times in the video Officer Bourque yelling stop
6  reaching, stop reaching.  This is an unknown -- you know
7  when Defense Counsel asked Officer Bourque all these
8  questions about how it is that you do this and Officer
9  Bourque had been responding it depends on the situation.
10 It depends upon the totality of the circumstances.  Here
11 was an officer acting alone engaged one to one with a
12 driver that he had no problem with.  You insert another
13 individual who enters the scene in the manner that the
14 Defendant did and now this Officer's attention is going
15 to be divided.  He had every reason to fear for his
16 safety as well as that of the driver.  Again, if he had
17 just complied with the Officer's commands or demands to
18 back up, and you know, a lot was made about hey, he
19 didn't have an opportunity to tell the Defendant exactly
20 how far back.  As the Officer testified even just with
21 the hey back up the Defendant didn't back up.  The
22 Defendant didn't back up not willingly.  That's why the
23 Officer had to continue to engage with him and force him
24 into this situation.  Had he complied he would not have
25 been charged with obstruction.  He had complied

58

1  initially he would not have been charged with the
2  resisting.  Officers -- you are going to have to assess
3  credibility.  There's nothing in the video or Officer
4  Bourque's testimony that would cause the Court to
5  question his veracity or his intention for that matter.
6  He was very honest in that he didn't believe that the
7  Defendant was trying to harm him necessarily with the
8  swat that's why the Defendant wasn't charged with a
9  battery on a protected person or a police officer but
10 that swat, Your Honor, I would argue was meant to resist
11 at that point in time the Officer was trying to detain
12 him and subsequently arrest him on the obstruction as
13 depicted in the video.  So I think at this point I think
14 we've proved by beyond a reasonable doubt that the
15 Defendant did hinder Officer Bourque's investigation and
16 detention of the Hyundai driver and that he resisted the
17 Officer's arrest or attempt to arrest him.  So we would
18 ask that you find the Defendant guilty of both charges.
19           THE COURT:  Thank you.  Defense?
20           MR. MEE:  Yes, Your Honor.  First of all,
21 you cannot obstruct an unlawful order.  I disagree with
22 the State that is not a First Amendment issue.  The
23 First Amendment in this context actually has two parts.
24 There's the filming and the right to film within a
25 reasonable distance.  The case law in all the federal

59

1  circuits, Your Honor, there's no twenty-one feet rule
2  that's been approved by court of which I am aware.
3  There is a ten-foot rule that seems to be the rule that
4  is applied by most of the federal circuits in
5  interpreting the First Amendment.  I submitted a bench
6  brief that kinds of goes through that issue.
7           THE COURT:  I don't have that.  When did you
8  submit it?
9           MR. MEE:  It was submitted yesterday, Your
10 Honor.
11          MS. BOTELHO:  At this point I move to strike
12 because it's untimely.  I got it this morning when I
13 walked into court.
14          THE COURT:  Go ahead.
15          MR. MEE:  The Officer's testimony that
16 there's essentially this 21-foot distance where anybody
17 can charge an officer and cause physical harm to an
18 officer if that is applied universally, Your Honor, it
19 totally diminishes and violates the First Amendment.
20 That is as the Officer testified a 21-foot radius that
21 he can attempt to impose I believe his testimony was
22 anytime there's not an obstacle between a person and
23 somebody that law enforcement is interacting with.
24 That's just not what the law requires, Your Honor.  The
25 First Amendment gives the media, new media, old media it

60

1  gives individuals the right to film government agents.
2  There is no dispute that that's the requirement.  If the
3  Officer is applying this 21-foot circumference to all
4  law enforcement interactions he's affectively eliminated
5  the ability to film law enforcement going about their
6  duties.  The commands to not to talk to the driver are
7  also not based on actual legal justification.  There is
8  no right to privacy in public.  There's no requirements
9  or no statute, no law, that citizens can't interact with
10 drivers that are interacting with law enforcement.  So
11 what's taken place here, Your Honor, is that this
12 Officer has taken it upon himself to essentially act as
13 the legislature and created these rules that have no
14 basis in any law and are in fact contrary to the First
15 Amendment.  Again, you can't obstruct an unlawful
16 demand.  There's no obstruction of justice here.
17 Resisting arrest, Your Honor, the Court can see the
18 video.  Essentially what happened is he walked over to
19 the front of the vehicle.  There was some dispute about
20 why he was being detained.  That was discussed.  The
21 case law in that area, Your Honor, is that if it's an
22 unlawful arrest which it was in this case because
23 they're essentially arresting him for violating these
24 unlawful orders that they're pronouncing.  Again the
25 case law you can passively resist an unlawful arrest.

61

1  That's all that occurred here, Your Honor.  Thank you.
2      THE COURT:  All right.  Mr. Decastro, please
3  stand.  The problem with the argument that your attorney
4  makes is it completely fails to consider the safety of
5  the officer and the safety of the driver.  The Officer
6  doesn't know who you are and the driver doesn't know who
7  you are.  You don't have any right to interfere with
8  that officer doing his investigation in deciding if he
9  wants to issue a ticket to this driver.  You also don't
10 have any business approaching the driver.  The driver
11 didn't ask you for help.  The driver didn't say help,
12 help, you know?  You didn't see an altercation happening
13 between the Officer and this driver.  The Officer didn't
14 protest that you were filming.  There's no problem with
15 filming.  You can film.  It's fine.  All right?  But you
16 did interfere with his investigation.  You did interfere
17 with his ability to do his job.  You did put him in a
18 position where he is concerned for his safety and the
19 safety of the driver.  So I believe the State has met
20 their burden beyond a reasonable doubt.  I'm going to
21 find you guilty of obstructing a public officer and
22 resisting a public officer.  I'd like to hear from State
23 and then your attorney prior to sentencing.
24     MS. BOTELHO:  Your Honor, in terms of
25 sentencing I would ask that the Defendant enter and

62

1  complete an impulse control class.  I would ask that the
2  Court lobby a $500 fine or the equivalent in community
3  service.  I would ask that the Defendant be ordered to
4  stay out of trouble for the pendency of the case.  I
5  would ask for a 90-day suspended sentence.  That's as to
6  each count to run concurrent.  That's our request.
7      THE COURT:  Defense?
8      MR. MEE:  Your Honor, I'm asking the Court
9  to sentence the Defendant to credit for time served for
10 these offenses.  Even if the Court concludes and the
11 Court did conclude that he didn't have the right to do
12 what he did, I think the Court can see that he sincerely
13 believes that he had the right to do so.  That's based
14 on his past experiences and the training he received in
15 reference to the First Amendment.  I don't think there's
16 any intent from the Defendant to engage in any
17 wrongdoing in this case, Your Honor.  That being the
18 case especially because of the public policy interest at
19 issue --
20     THE COURT:  When you say he doesn't wish to
21 engage in any wrongdoing, it seems to me from observing
22 him in the video he wants -- he wants this.  He wants to
23 get arrested.  He wants to get into an altercation with
24 the police officers.  He welcomes this.  This helps his
25 You Tube channel.  He called the officers here in my

63

1  courtroom today pigs.  He called -- and he's nodding his
2  head up and down.
3      THE DEFENDANT:  I agree.
4      THE COURT:  So apparently he hates every law
5  enforcement officer in the United States.  Please stand
6  up, sir.  Are you finished?
7      MR. MEE:  I would emphasize, Your Honor,
8  that the Defendant testified and he sincerely believes
9  he is providing a public service when he reviews and
10 films these incidents.  I understand the Court might
11 have a different view of that but when we're talking
12 First Amendment public policy issues such as supervising
13 people involved in government, I think that is something
14 the Court can take into consideration.  I will submit.
15     THE COURT:  All right.  Mr. Decastro, please
16 stand.  I hereby sentence you to 90 days in the Clark
17 County Detention Center on Count 1.  90 days in the
18 Clark County Detention Center on Count 2 to run
19 consecutive for a total of 180 days in custody.  Thank
20 you.
21     THE DEFENDANT:  Sentence suspended or --
22     THE COURT:  Oh, no.  It's going to start
23 right now.
24 / / /
25 / / /

64

1          *  *  *  *  *
2
3  ATTEST:  FULL, TRUE AND ACCURATE
4  TRANSCRIPT OF PROCEEDINGS.
5
6     \s\Christa Broka
7  CHRISTA D. BROKA, CCR 574

65

1  IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP
2     COUNTY OF CLARK, STATE OF NEVADA
3          -o0o-
4
5  STATE OF NEVADA,      )
6       Plaintiff,   )
7    vs.              ) Case No. 23CR013015
8  JOSE DECASTRO,       ) ATTEST RE: NRS 239B.030
9    Defendant,        )
10 _____)
11
   STATE OF NEVADA)
12          ) ss
   COUNTY OF CLARK)
13
14     I, Christa D. Broka, a Certified Shorthand
15 Reporter within and for the county of Clark and the
16 State of Nevada, do hereby certify:
17     That REPORTER'S TRANSCRIPT OF PROCEEDINGS was
18 reported in open court pursuant to NRS 3.360 regarding
19 the above proceedings in Las Vegas Justice Court 8,
20 2024, Lewis Avenue, Las Vegas, Nevada.
21     That said TRANSCRIPT:
22  X    Does not contain the Social Security number
23 of any person.
24 __    Contains the Social Security number of a
25 person.

66

1       ATTEST:  I further certify that I am not
2  interested in the events of this action.
3
4            \s\Christa Broka
5            CHRISTA D. BROKA, CCR 574
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

0038

# JUSTICE COURT, LAS VEGAS TOWNSHIP

## CLARK COUNTY, NEVADA

* * * *

FILED
2024 MAR 20 P 1: 34
JUSTICE COURT
LAS VEGAS NEVADA
BY _____
   DEPUTY

| | |
|---|---|
| DeCastro, Jose | |
| Appellant, | District Court Case No.: C-24-381730-A |
| -vs- | Justice Court Case No.: 23-CR-013015 |
| STATE OF NEVADA | APPEAL FROM |
| Respondent, | LAS VEGAS JUSTICE COURT |

### APPEARANCES

FOR APPELLANT:

Attorney: Micheal Mee, Esq.
400 S. 4th Street #500
Las Vegas, Nevada 89101

FOR RESPONDENT:

STEVE WOLFSON
DISTRICT ATTORNEY
CLARK COUNTY COURTHOUSE
LAS VEGAS, NEVADA

### CERTIFICATION

I hereby certify the following to be the original proceedings of the above case. WITNESS my hand this date: March 20, 2024.

*[signature]*
Ann E. Zimmerman
Justice of the Peace, Las Vegas Township

23-CR-013015
APA
Appeal from LVJC – Appearances
16921463

*[barcode]*

IMAGED
JV