UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOSE DECASTRO, | Case No. 2:23-cv-00580-APG-EJY |
| Plaintiff, | **Order (1) Granting in Part Plaintiff's Motion for Reconsideration and (2) Granting in Part Defendants' Motion for Summary Judgment** |
| v. | |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, STATE OF NEVADA, BRANDEN BOURQUE, JASON TORREY, C. DINGLE, B. SORENSON, JESSE SANDOVAL, and OFFICER DOOLITTLE, | [ECF Nos. 64, 86] |
| Defendants. | |

Plaintiff Jose DeCastro sues the Las Vegas Metropolitan Police Department (LVMPD) and several LVMPD officers: Branden Bourque, Jason Torrey, Chadly Dingle, Brandon Sorenson, Jesse Sandoval, and Clinton Doolittle.[1]  DeCastro contends the officers unreasonably searched and seized him because he was exercising his First Amendment rights to video record a police encounter and made rude comments to the arresting officer.  He also alleges they used excessive force.

I previously granted in part the defendants' motion to dismiss DeCastro's first amended complaint (FAC), with leave to amend most claims. ECF No. 44.  However, I dismissed with prejudice DeCastro's Fourth Amendment claim for an unreasonable seizure and state law claims for false imprisonment, invasion of privacy, and negligence based on his arrest and search of his person.  I did so because I concluded that, based on the FAC's allegations, Bourque had probable cause to arrest DeCastro. *Id.* at 4-7, 13-15.  With respect to the federal claim, I alternatively ruled

---

[1] DeCastro also sued the State of Nevada and an officer named Citco, but I dismissed those defendants for failure to timely serve them. ECF Nos. 85; 94.

that even if Bourque and the other officers did not have probable cause, they were reasonably mistaken about whether probable cause existed and therefore would be entitled to qualified immunity. *Id.* at 7.  And with respect to the state law false imprisonment and negligence claims, I alternatively ruled that the officers would be entitled to discretionary immunity for the arrest decision. *Id.* at 13-14.

DeCastro thereafter filed a second amended complaint (SAC). ECF No. 61.  In the SAC, DeCastro asserts claims against the defendants for:

(1) arrest without probable cause or a warrant under the U.S. and Nevada constitutions and federal and state statutory and common law;

(2) unreasonable search and seizure under the U.S. and Nevada constitutions and federal and state statutory and common law;

(3) excessive force under the U.S. and Nevada constitutions and federal and state statutory and common law;

(4) defamation under the U.S. and Nevada constitutions and federal and state statutory and common law;

(5) First Amendment "chilling" under the U.S. and Nevada constitutions and federal and state statutory and common law;

(6) First Amendment retaliation under the U.S. and Nevada constitutions and federal and state statutory and common law;

(7) *Monell* and supervisory liability under the U.S. and Nevada constitutions and federal and state statutory and common law against Torrey and LVMPD;

(8) selective enforcement and equal protection violations under the U.S. and Nevada constitutions and federal and state statutory and common law;

(9) battery under the U.S. and Nevada constitutions and federal and state statutory and common law against Sandoval;

(10) invasion of privacy under the U.S. and Nevada constitutions and federal and state statutory and common law;

(11) negligence under the U.S. and Nevada constitutions and federal and state statutory and common law;

(12) failure to intervene under the U.S. and Nevada constitutions and federal and state statutory and common law;

(13) civil conspiracy under the U.S. and Nevada constitutions and federal and state statutory and common law;

(14) abuse of process under the U.S. and Nevada constitutions and federal and state statutory and common law; and

(15) *Monell* failure to train against Torrey and LVMPD.

DeCastro moves to reconsider my prior order dismissing certain claims with prejudice. ECF No. 64.  The defendants oppose reconsideration and move for summary judgment. ECF Nos. 70; 86.  After summary judgment briefing was completed, DeCastro moved for leave to file additional briefing to address the new development of his convictions being overturned by the Eighth Judicial District Court, Clark County, Nevada. ECF No. 92.  I granted leave for the parties to submit cross briefs regarding the impact of (1) DeCastro's convictions being overturned and (2) the significance of a new decision from the Nevada Court of Appeals: *Willson v. First Judicial District Court in & for County of Carson City*, 547 P.3d 122, 127 (Nev. Ct. App. 2024). ECF No. 93.  The parties have filed supplemental briefs. ECF Nos. 95; 96; 98.

I grant in part DeCastro's motion for reconsideration.  I grant in part the defendants' motion for summary judgment.  I seal the video exhibits the defendants provided because they contain non-parties' personal identifiers, and I order the defendants to provide redacted versions.

/ / / /

/ / / /

/ / / /

/ / / /

# I. BACKGROUND[2]

In March 2023, Bourque conducted a traffic stop on a driver for having an expired and suspended registration. *Bourque 1618* at 00:30-00:40; ECF No. 90-1 at 4.  The traffic stop took place in a shopping center's public parking lot. ECF No. 90-1 at 4; *Bourque 1618* at 00:00-00:30. After speaking with the driver, Bourque went to his patrol car to conduct a background check on the driver. *Bourque 1618* at 03:30; ECF No. 90-1 at 4, 10.  While Bourque was in his patrol car, DeCastro approached the driver while filming on a cellphone camera. *Bourque 1618* at 09:10-09:30; Ex. H at 0:00:03-0:00:10.  DeCastro positioned himself about a half a parking space away from the driver and started speaking with her. *Bourque 1618* at 09:29-09:31; *see also* Ex. H at 0:00:09.

Bourque exited his patrol vehicle, told DeCastro not to engage with the driver, and told DeCastro three times to back up. *Bourque 1618* at 09:29-09:43.  Bourque also told DeCastro he can film, but he needs to stay away from the driver. *Id.* at 09:40-09:43.  DeCastro backed up about a foot or two. *Id.*  Bourque twice more told DeCastro to back up and warned him that if he did not back up, Bourque would detain him. *Id.* at 09:45-09:47.  DeCastro did not back up and stated, "you're going to detain me how?" *Id.* at 09:47-09:50; Ex. H. at 0:00:20-0:00:25.  Bourque

---

[2] The background facts are derived from the officers' body worn camera (BWC) videos and video clips from DeCastro's YouTube channel. ECF No. 87.  I also cite Bourque's testimony at DeCastro's criminal trial. ECF No. 90-1.  I cite the BWC videos by officer name, video number if more than one video per officer is presented, and the approximate time stamp on the video exhibit's runtime (not the time of day indicated in the video), *e.g.*, Bourque 1618 at 00:00.  I cite the YouTube videos by exhibit letter and the approximate time stamp on the video exhibit's runtime, *e.g.*, Ex. H at 0:00:00.  Some of the audio is difficult to hear due to the wind making noise in the officers' microphones.  I have left out some details of the incident, including the specifics of some comments between DeCastro and the officers, the facts surrounding the officers allowing DeCastro to call a family member to retrieve his dog from his car, and the officers locking DeCastro's car and leaving it in the shopping center parking lot.

said for obstructing and told him to move away, but DeCastro responded that he was "staying right here." Ex. H at 0:00:26.

DeCastro then backed up a step and was pointing to demonstrate the distance he was from the front of the driver's vehicle. *Bourque 1618* at 9:50-9:54.  DeCastro stated that he was ten feet away from the vehicle and that he is a "constitutional law scholar," and he took a small step back with both feet and then pivoted and made a half step forward with his left foot. *Id.* at 9:52-09:59; Ex. H at 0:00:26.  Bourque told DeCastro that the driver deserves privacy and that the traffic stop is "not his business." *Bourque 1618* at 09:59-10:02.  Bourque did not believe the driver was entitled to privacy, but he hoped this statement would encourage DeCastro to back away. ECF No. 90-1 at 10.  DeCastro responded by telling Bourque that DeCastro is "a member of the press" and "go get in your car and do your job little doggie." *Bourque 1618* at 10:02-10:06; Ex. H at 0:00:38-0:00:42.

At that point, Bourque began to approach DeCastro and told him he was being detained. *Bourque 1618* at 10:08-10:10  As Bourque approached, DeCastro backed away. *Id.*  Bourque then told the driver she was free to go. *Id.* at 10:11.  DeCastro continued to film the incident with his cellphone while Bourque told DeCastro to come over to the patrol car. *Id.* at 10:11-10:17.  DeCastro refused and moved away from Bourque when Bourque approached him. *Id.* at 10:16.  Bourque again told DeCastro to go over to the patrol car and reached out a hand toward DeCastro. *Id.* at 10:17.  DeCastro moved away and told Bourque not to put his hands on DeCastro. *Id.* at 10:18-10:21; Ex. H at 0:01:20-0:01:25.  Bourque responded by again telling DeCastro to move over to the patrol car and that he was going to put his hands on DeCastro. *Bourque 1618* at 10:22.  DeCastro responded "No, you're not." *Id.* at 10:23.

Bourque then called for assistance over his police radio. *Id.* at 10:23-10:30.  He told DeCastro to move over to the patrol car two more times, to which DeCastro responded, "no." *Id.* at 10:38-10:40.  Bourque again called for assistance. *Id*. at 10:41-10:46.  Bourque approached DeCastro and told him to go to the patrol car as DeCastro backed away. *Id.* at 10:46.  Bourque also stated to DeCastro, "I'm going to grab you." *Id.* at 10:47.  DeCastro responded "no, you're not." *Id.* at 10:49.  Bourque told DeCastro "you're going to go to the ground." *Id.* at 10:49. DeCastro again responded that he would not. *Id.* at 10:50.  Bourque advised DeCastro that he was detained but DeCastro did not comply with the order to move toward the car and instead requested a supervisor respond to the scene. *Id.* at 10:53.  Bourque again called for assistance and again told DeCastro to go over to the patrol car. *Id.* at 10:55-10:58.  At that point, DeCastro turned and walked toward the patrol car while continuing to film the incident on his cellphone. *Id.* at 11:05.

Bourque told DeCastro he was being detained for obstruction and to set the cellphone down on the car's hood. *Id.* at 11:07.  Before reaching the patrol car, DeCastro turned around to face Bourque, repeated that he was a constitutional law scholar, and objected to Bourque detaining him. *Id.* at 11:10.  Bourque repeated his command to set the phone on car's hood. *Id.* Bourque then reached both hands toward DeCastro and told DeCastro he was being detained. *Id.* at 11:14.  DeCastro backed away and appears to swat or attempt to swat away Bourque's hand. *Id.* at 11:15.  Bourque stated "Now you're going to put your hands on me?" *Id.*  Bourque grabbed the front of DeCastro's shirt with two hands and maneuvered him to the front of the patrol car. *Id.* at 11:17-25.  DeCastro stated "let it roll," to which Bourque responded that he did not care about the filming. *Id.* at 11:25.  DeCastro asked why Bourque was grabbing him. *Id.*  He also announced that he is a member of the press. *Id.* at 11:28; *see also Dingle* at 4:55.  Meanwhile,

Bourque told DeCastro to turn around four times. *Bourque 1618* at 11:28. DeCastro did not do so. *Id.*

Dingle arrived on the scene and took hold of DeCastro's right arm. *Id.* at 11:34; *Dingle* at 5:02. Bourque had a grip on DeCastro's left wrist. *Id.* DeCastro asked Dingle if his camera was on, and Dingle responded that it was. *Id.* Bourque ordered DeCastro to put his hands behind his back, but DeCastro said "no." *Bourque 1618* at 11:38. DeCastro did not submit to Dingle and Bourque's efforts to move his hands behind his back and in response to Bourque's continued orders to put his hands behind his back, he asked "why," asserted that he had done nothing wrong, and stated that he would not put his hands behind his back. *Id.* at 11:40-11:51. Bourque again ordered DeCastro to turn around and Dingle advised him that it is policy to handcuff behind the back and not in the front. *Id.* at 11:54.

Bourque advised DeCastro that as of that moment, he was getting a ticket but if he did not put his hands behind his back, he was going to jail. *Id.* at 11:59. DeCastro responded "for what?" but still did not put his hands behind his back. *Id.* Bourque again ordered him to put his hands behind his back, to which DeCastro responded by asking if he could turn his camera around to face himself. *Id.* at 12:02. Bourque said no and said he did not know if DeCastro had any weapons. *Id.* at 12:02-12:09. DeCastro denied he had weapons. *Id.* at 12:09. DeCastro repeated that he was a constitutional law scholar and Bourque again told DeCastro to put his hands behind his back or he was going to jail, and that Bourque was placing DeCastro in handcuffs. *Id.* at 12:13-12:17. When Bourque again told him to turn around, DeCastro said "for officer safety, right?" and Bourque said yes. *Id.* 12:20. At that point, DeCastro started to turn around to face the patrol car, but then he turned back to Bourque and stated the camera was still running. *Id.* at 12:22. Bourque and Dingle maneuvered DeCastro to again face the front of the

car and Bourque ordered him to put his hands behind his back. *Id.* at 12:30.  Dingle and Bourque then placed DeCastro in a set of double handcuffs after DeCastro informed them he had a shoulder injury. *Dingle* at 6:20.

Bourque patted DeCastro down for weapons. *Id.* at 8:43.  While Bourque patted DeCastro down, DeCastro stated "now you just hit me in the dick," and similar comments claiming that Bourque struck DeCastro in the genital area for "no reason." *Id.* at 8:55.  Dingle asked DeCastro for his name, which DeCastro provided. *Id.* at 9:06, 11:30.  DeCastro also asserted that the handcuffs were hurting his wrists. *Id.* at 9:19.  DeCastro asked Bourque if he had seen DeCastro's videos, and Bourque said no, he did not care about the video. *Id.* at 9:26.  Shortly thereafter, Sorenson and Doolittle arrived on the scene. *Id.* at 10:05; *Doolittle* at 00:28.

Sorenson told DeCastro to face the front of the patrol car, meanwhile DeCastro told the officers that he "sue[s] cops all over the country." *Dingle* at 10:57; *Sorenson 1631* at 3:45. Dingle thereafter went to his patrol car to look up DeCastro's information, while Dingle and Bourque continued to discuss the incident and DeCastro asked again for a supervisor to come to the scene. *Dingle* at 12:05-14:36.

Dingle advised Doolittle that there was a warrant for DeCastro's arrest. *Id.* at 14:48; *Doolittle* at 2:13.  Dingle stated to Doolittle "isn't this the First Amendment auditor dude?" and referenced some other incident at a Walmart. *Dingle* at 14:57.  Dingle then reported the warrant to Bourque and told Bourque that DeCastro was "that First Amendment dude" or something to that effect. *Dingle* at 16:45.

In the meantime, Sandoval stood near DeCastro without touching him, and directed DeCastro to face Bourque's patrol car. *Doolittle* at 4:05.  DeCastro remained in the area in front of the patrol car but would often turn in different directions rather than face the patrol car while

he called Sandoval names and stated, "why don't you drop down on your knees and suck my cock?" *Doolittle* at 4:23, 5:05, 5:37; *Sorenson 1639* at 1:22, 2:25.

As DeCastro continued to move around in front of the car, Sandoval took hold of DeCastro's left arm. *Doolittle* at 5:56; *Sorenson 1639* at 3:17.  DeCastro asked why Sandoval was grabbing him, and Doolittle responded that it was because DeCastro was not listening. *Doolittle* at 6:05.  DeCastro complained that there was no need to touch him because he was not going anywhere. *Id.* at 6:09.  Sandoval responded that because DeCastro kept facing the officers, there was a chance he would and that was why Sandoval was having DeCastro face the front of the patrol car. *Id.* at 6:10.  DeCastro continued to use verbally abusive language, mostly directed at Sandoval. *Id.* at 6:20.  DeCastro then shouted that Sandoval was squeezing his arm and he asked Sandoval why he was squeezing his arm. *Id.* at 6:28.  Sandoval responded, "because you continually move around" and because DeCastro was pulling away from him. *Id.* at 6:29, 7:19. He also told DeCastro that he would not have to hold DeCastro if DeCastro would face the vehicle as instructed. *Id.* at 6:35.  Sandoval also stated that he needed to hold on to DeCastro to keep DeCastro from falling if DeCastro ran away with his hands restrained behind his back. *Id.* at 7:03, 7:24; *Sorenson 1639* at 4:23.

Bourque advised DeCastro that sergeant Torrey was going to respond to the scene in response to DeCastro's request for a supervisor. *Bourque 1644* at 00:40.  DeCastro stated that he was going to file a complaint against Bourque, and that Bourque could not arrest him just for filming. *Id.* at 00:40-1:00.  Bourque responded that he told DeCastro to back up. *Id.* at 1:00. DeCastro continued to assert he did nothing wrong and did not pose a threat to the officer. *Id.* at 1:00-1:14.  Bourque commented that DeCastro's "lips are all white." *Id.* at 1:15.  DeCastro stated that was because he was mad and needed water. *Id.*  Bourque stated DeCastro's lips were like

1  that before the incident and asked DeCastro if he used any drugs. *Id.* at 1:18-1:22.  DeCastro

2  responded that he knew that Bourque was trying to make him look like a criminal, but it would

3  not work because he had no criminal history. *Id.* at 1:30.  Bourque and DeCastro then discussed

4  whether there was a warrant for DeCastro and whether it was out of the state of Ohio where

5  DeCastro stated he was suing other police officers. *Id.* at 1:38.

6       Bourque returned to his vehicle and began typing up documentation related to the arrest.

7  *Id.* at 2:00.  While Bourque was in his car, DeCastro continued to engage with Sandoval,

8  Sorenson, and Doolittle, with Dingle occasionally approaching and walking away. *Dingle* at

9  22:15.  Throughout this period, DeCastro made disparaging comments, mostly directed at

10  Sandoval, including that Sandoval had a "tiny penis," while Sandoval had his right hand on

11  DeCastro's arm around the elbow area. *Id.* at 21:58-22:43; *Doolittle* at 10:15.  Sandoval

12  suggested that DeCastro was on a narcotic, which DeCastro denied. *Dingle* at 22:22.  DeCastro

13  explained that his lips were white because his mouth was dry, as he was "surrounded by five

14  fucking pigs." *Id.* at 22:28.

15       DeCastro also made comments to Dingle, Doolittle, and Sorenson that Sandoval was

16  squeezing his arm and hurting him. *See, e.g.*, *Dingle* at 23:08, 24:07, 40:10-40:25; *Doolittle* at

17  26:10.  DeCastro told Sorenson, Doolittle, and Dingle that they could tell Sandoval to let go of

18  his arm. *Dingle* at 40:35; *Doolittle* at 27:52.  At one point, DeCastro complained that Sandoval

19  was squeezing him "even harder," to which Sandoval responded that was because DeCastro was

20  continually moving away. *Dingle* at 41:25; *Doolittle* at 28:52; *Sorenson 1639* at 26:10.  Sandoval

21  denied he was hurting DeCastro and stated that he was holding onto DeCastro as policy required

22  him to do so that DeCastro did not fall. *Dingle* at 41:35; *Doolittle* at 28:11.  Sandoval also told

23  DeCastro that whenever he moved that "creates a reaction." *Sandoval* at 1:39.

DeCastro can be heard on Bourque's and Dingle's BWC complaining about Sandoval squeezing his elbow. *See, e.g.*, *Bourque 1644* at 4:28, 6:00, 7:24, 8:55, 11:49, 13:25; *Dingle* at 19:05.  While Bourque was in the patrol car working on his report, he heard DeCastro complain that Sandoval was hurting DeCastro at least once because Bourque commented on his BWC that DeCastro--

> keeps saying that [Sandoval is] hurting him, but I can see from my perspective, and hopefully the body cam too, that he's just holding the handcuffs and I did the same thing.  I was just holding the handcuffs lightly and he kept saying I was twisting them.  And I was not doing an ignition lock even though it is an approved technique.  We were literally just lightly handling the handcuffs, touching the handcuffs, and he thinks that we're hurting him.

*Bourque 1644* at 20:51-21:15.  At the time Bourque made this comment, his BWC does not show the placement of Sandoval's hand on DeCastro.  However, at other points in Bourque's BWC video, Sandoval's hand is visible on DeCastro's arm.  It is unclear whether Bourque observed that because he was typing his report.

DeCastro began to loudly state "stop squeezing," and pulled his arm out of Sandoval's grip. *Dingle* at 41:50; *Doolittle* at 29:15.  At that point, Sandoval placed his left arm under DeCastro's left arm, and DeCastro complained that it hurt his shoulder. *Dingle* at 41:55; *Doolittle* at 29:16.  DeCastro's complaint that Sandoval was hurting his shoulder is audible on Bourque's BWC, and Bourque exited his patrol car as that happened. *Id.* at 22:18.  Sandoval then took DeCastro's keys and a second phone out of DeCastro's pocket and placed DeCastro in the back of Bourque's patrol car. *Dingle* at 42:05; *Sorenson 1639* at 26:55.

Due to DeCastro's request to speak to a supervisor, Torrey arrived on the scene and spoke to DeCastro while DeCastro was seated in the back of Bourque's patrol car. Ex. H at 0:55:59.  DeCastro told Torrey that his rights were violated and that Sandoval "tortured" him. *Id.*

at 56:11.  Torrey responded that he looked at the BWC and DeCastro was "clearly obstructing," refused to obey numerous commands to step back, and then resisted detainment. *Id.* at 0:56:29. Torrey also told DeCastro it was fine for him to film, but he could not get in the middle of a traffic stop. *Id.* at 1:05:23; 1:09:33.  Based on this incident, DeCastro sued LVMPD and all the officers involved on a variety of state and federal claims.

## II.  ANALYSIS

A district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient" so long as it has jurisdiction. *City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (quotation and emphasis omitted); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) (citing Fed. R. Civ. P. 54(b)).  "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *see also* LR 59-1(a).  A district court also may reconsider its decision if "other, highly unusual, circumstances" warrant it. *Sch. Dist. No. 1J, Multnomah Cnty., Or.*, 5 F.3d at 1263.

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence

of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and

reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of

Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

I previously set forth the law on the elements of a claim under 42 U.S.C. § 1983,

qualified immunity, and probable cause. *See* ECF No. 44 at 3-6.  I incorporate that law in this

order.

### A.  Failure to Intervene and Supervisory Liability (Counts 7, 12, 15)

Count twelve of the SAC alleges that the individual defendants violated federal and state

law by failing to intervene in the other defendants' actions when they had a reasonable

opportunity to do so. ECF No. 61 at 29-30.  Counts seven and fifteen seek to impose liability on

Torrey as a supervisor. *Id.* at 24-25, 32-33.  I will address the officers' liability for failure to

intervene when evaluating the underlying claims.  Likewise, I will address Torrey's liability as a

supervisor when evaluating the underlying claims.

### B.  False Arrest and Unreasonable Search (Counts 1, 2, 10, and 11)

Count one of the SAC alleges DeCastro's arrest violated the U.S. and Nevada

Constitutions because the officers lacked probable cause and had no warrant. ECF No. 61 at 19.

Count two of the SAC alleges that in relation to the arrest, the officers searched DeCastro and

took items out of his hands and pocket. *Id.* at 20.  DeCastro alleges that because the arrest was

done without probable cause, the search of his person was unreasonable under the U.S. and

1   Nevada Constitutions. *Id.*  Count ten of the SAC alleges that the defendants invaded DeCastro's

2   privacy by searching his pockets, wallet, cell phone, and car "without a warrant or other legal

3   justification." ECF No. 61 at 27-28.  Count eleven asserts the officers were negligent in arresting

4   and searching him without probable cause.[3] *Id.* at 28-29.

5        In their summary judgment motion, the defendants argue that I dismissed these claims

6   with prejudice in my prior order.  DeCastro requests that I reconsider my order dismissing these

7   claims.  He asserts that he did back up in response to Bourque's commands, and Bourque did not

8   tell him how far to back up, so Bourque lacked probable cause to arrest him.  He also argues that

9   he had a clearly established right to film, so Bourque's orders to back up and the subsequent

10  detainment, search, and arrest violate clearly established law.  In supplemental briefing,

11  DeCastro argues that his state court conviction was overturned and that the judge who overturned

12  it found that he followed Bourque's orders by ceasing to speak to the driver and backing up, and

13  that Bourque did not tell him how far to back up.  He also argues that under the Nevada Court of

14  Appeals' *Willson* decision, Bourque lacked probable cause because obstruction is limited to

15  fighting words or physical acts, and because there was no evidence that DeCastro had the

16  specific intent to obstruct Bourque's traffic stop.  He also argues that Bourque was not actually

17  hindered because Bourque chose to let the driver go to turn his attention to DeCastro.

18       In the defendants' supplemental briefs, they argue that the fact that DeCastro's

19  convictions were overturned should have no impact on my prior decision because they were not

20  parties to the criminal proceeding.  The defendants also argue that *Willson* confirms that Bourque

21  had probable cause to arrest DeCastro for obstruction because DeCastro intentionally disobeyed

22  Bourque's lawful orders.  The defendants contend that there is no unfettered First Amendment

23

---

[3] The negligence claim is also based on other acts, which I address elsewhere in this order.

right to film police activity because the right to film is subject to reasonable time, place, and manner restrictions. They assert that they are entitled to qualified immunity because there is no clearly established law dictating how close a citizen can stand to film a traffic stop or whether the citizen can ignore the officer's order to back up. And the defendants argue that *Willson* cannot be a source of clearly established law because it was issued after the incident in this case.

### 1. Probable Cause

The FAC alleged that when Bourque initially told DeCastro to back up, he did. ECF No. 13 at 6. But the FAC then alleged that when Bourque told DeCastro to back up again or Bourque would detain him, DeCastro asserted his right to film the interaction, stated that he "ha[d] a right to be here" and "continued to assert his rights." *Id.* Given DeCastro's allegation that he had backed up the first time, paired with his allegation that he was asserting his rights to stay where he was when Bourque directed him to back up further, the FAC did not allege that DeCastro backed up again when ordered to do so. *Id.*

However, DeCastro has amended his complaint. ECF No. 61 at 11-12. The BWC videos have been provided to the court, and DeCastro's criminal conviction for obstruction has been overturned on appeal. ECF Nos. 87; 92-1; 99. In overturning DeCastro's obstruction conviction, the state court judge found that "DeCastro did in fact back up when ordered to do so."[4] ECF No. 92-1 at 5. Although the state court judge was applying a different standard than probable cause and her finding does not reflect the only possible interpretation of the BWC video regarding DeCastro's compliance with Bourque's orders, it is a reasonable one. Because reasonable minds could differ, genuine disputes remain regarding whether Bourque had probable cause to arrest

---

[4] The defendants argue I should not consider the state court's findings because the order was prepared by DeCastro's counsel in the criminal trial. However, the state court judge signed the order with these findings, and I have no basis to conclude she did not mean what she said.

DeCastro for obstruction.  I therefore reconsider my ruling that Bourque had probable cause as a matter of law.

The Nevada Court of Appeals' decision in *Willson*, decided after this incident and after my prior order, does not definitively settle the question one way or the other.  In *Willson*, the Nevada Court of Appeals addressed a challenge to a conviction under Nevada's obstruction statute, Nevada Revised Statutes (NRS) § 197.190.  In doing so, the court interpreted the portion of § 197.190 that is at issue in this case, which makes it a crime to "willfully hinder, delay or obstruct any public officer in the discharge of official powers or duties." 547 P.3d at 129.  First, the court held that under this portion of the obstruction statute, the defendant does not have to be given "due notice" before he can be found guilty of willfully hindering, delaying, or obstructing a public officer. *Id.* at 129-30.  Second, the court held that the defendant cannot be convicted unless he has the specific intent to hinder, delay, or obstruct a public officer. *Id.* at 132.  Finally, the court held that to avoid a potential clash with the First Amendment, a defendant can be convicted only if he hindered, delayed, or obstructed through "physical conduct and fighting words." *Id.* at 133-34.  The court stated that physical conduct would include "a person's action (e.g., blocking the path of an officer) or inaction (e.g., refusing to obey a lawful order)." *Id.* at 134.

Bourque did not have the benefit of this decision at the time of this incident, and thus would not have made a probable cause determination based on this interpretation of the statute. However, a reasonable jury could find that Bourque had probable cause to suspect that DeCastro violated this statute even with this interpretation because DeCastro refused to obey Bourque's orders to back up and Bourque reasonably could have concluded from DeCastro's words and actions that he specifically intended to disrupt Bourque's official duties during a traffic stop.

And a reasonable jury could find that DeCastro resisted Bourque's (and Dingle's) efforts to detain him.  Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).  Rather, it requires "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (simplified); *see also District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (stating that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity" (quotation omitted)).  However, because a reasonable jury could find that DeCastro complied with Bourque's orders, a reasonable jury could also find that DeCastro did not obstruct within *Willson*'s meaning.

The parties give little attention to the resisting arrest charge against DeCastro.  DeCastro asserts generally that because he was entitled to disobey Bourque's orders, everything flowing from the initial unlawful orders was also unlawful.  However, under Nevada law, a person does not have the right to "resist, delay or obstruct a public officer in discharging or attempting to discharge any legal duty of his office" even if the initial seizure was unlawful, unless the resisting individual was "facing imminent and serious bodily harm at the hands of the police officer." *State v. Lisenbee*, 13 P.3d 947, 951 (Nev. 2000) (quotation omitted).  Consequently, even if Bourque's initial detention of DeCastro was unlawful, the officers may still have probable cause to arrest DeCastro for resisting arrest.  The state court judge who overturned DeCastro's obstruction conviction also overturned his resisting arrest conviction. ECF No. 92-1. In doing so, she found that "DeCastro did not Obstruct Ofc. Bourque nor did Mr. DeCastro resist arrest." *Id.* at 6.  Given this finding, a reasonable jury could reach the same conclusion, although that is not the only reasonable view of the evidence.  Consequently, whether the officers had probable cause to arrest DeCastro for obstruction or resisting arrest are jury questions.

/ / / /

Because I dismissed DeCastro's invasion of privacy claim based on the prior probable cause ruling, I reconsider that dismissal.[5] *See* ECF No. 44 at 14. However, because I previously dismissed it, the parties have not addressed this claim on summary judgment. I therefore will allow the parties to file another motion for summary judgment on this claim.

### 2. Qualified Immunity for Federal Claims

I do not reconsider my ruling that the officers are entitled to qualified immunity on the federal Fourth Amendment claims. First, DeCastro is incorrect that qualified immunity should not be resolved at dismissal. Because qualified immunity "is an immunity from suit rather than a mere defense to liability," the United States Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (simplified). Thus, it is appropriate to dismiss if, accepting DeCastro's allegations as true, qualified immunity applies "based on the complaint itself." *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023). Moreover, the parties have now briefed the issue on summary judgment and through supplemental briefing.

Second, even assuming a jury finds that Bourque lacked probable cause to arrest, he is entitled to qualified immunity because he "reasonably but mistakenly concluded that probable cause was present." *Wesby*, 583 U.S. at 65 (simplified). Although DeCastro backed up a foot or two, a reasonable officer in Bourque's shoes could have concluded that he did not back up in any meaningful way. Further, DeCastro communicated to Bourque that he was not going to back up any further when he stated that he would stay right where he was regardless of Bourque's

---

[5] I also dismissed DeCastro's negligence claim based on the arrest and search. ECF No. 44 at 14. However, I explain below why DeCastro's negligence claim fails as a matter of law.

1   commands.[6]  DeCastro has not pointed to clearly established law that would have put Bourque

2   on notice that, if his orders to back up were met with minimal compliance and verbal statements

3   that the person would not back up further despite being ordered to do so, he would violate the

4   Fourth Amendment by arresting the person for obstruction.

5          DeCastro contends that Bourque's commands to back up were unlawful, but it is

6   DeCastro's burden to point to clearly established law that would have put the officers on notice

7   that their conduct would violate DeCastro's Fourth Amendment rights. *Moore v. Garnand*, 83

8   F.4th 743, 753 (9th Cir. 2023).  Although DeCastro does not need to identify "a case directly on

9   point," a right is clearly established only "if it has been settled by controlling authority or a

10  robust consensus of cases of persuasive authority that clearly prohibits the officer's conduct in

11  the particular circumstances, with a high degree of specificity." *Hopson v. Alexander*, 71 F.4th

12  692, 697 (9th Cir. 2023) (simplified).  In other words, "a constitutional violation is clearly

13  established only if existing law placed the constitutionality of the officer's conduct beyond

14  debate, such that every reasonable official would understand that what he is doing is unlawful."

15  *Id.* (simplified).

16

17

18  _____

19  [6]  In overturning the conviction, the state court judge was not evaluating whether Bourque had
    probable cause.  Rather, she was acting as an appellate court reviewing whether the Justice Court
20  "erred when it convicted" DeCastro, which involves applying a higher standard than probable
    cause. ECF No. 92-1 at 4; *Compare United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005)
    ("The test for whether probable cause exists is whether at the moment of arrest the facts and
21  circumstances within the knowledge of the arresting officers and of which they had reasonably
    trustworthy information were sufficient to warrant a prudent man in believing that the petitioner
22  had committed or was committing an offense." (simplified)), *with Dean v. Hocker*, 409 F.2d 319,
    320-21 (9th Cir. 1969) (stating that a defendant in Nevada has the "right to the presumption of
23  innocence which continues until guilt has been shown beyond a reasonable doubt); NRS
    § 175.211 (setting forth the jury instruction for the definition of reasonable doubt that must be
    given in Nevada criminal cases).

DeCastro has not pointed to clearly established law that, even when viewing the facts in the light most favorable to DeCastro, would put a reasonable officer in Bourque's shoes on notice that he would violate DeCastro's Fourth Amendment right to be free from an unreasonable seizure and search incident to arrest in these circumstances.  DeCastro cites NRS § 171.1233, which provides for permission to record police activity and prohibits law enforcement from interfering with recording.  But this state statute does not define clearly established law for Fourth Amendment violations. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) (concluding that Fourth Amendment protections are not governed by state laws that may "vary from place to place and from time to time" (quotation omitted)).  Moreover, the statute itself provides that it "must not be construed to authorize a person to engage in actions that interfere with or obstruct a law enforcement activity or otherwise violate any other law in an effort to record a law enforcement activity." NRS § 171.1233(1).  This statute therefore does not provide clearly established law that would have put Bourque on notice that he could not advise DeCastro that he can keep filming but must back up and that Bourque could not arrest DeCastro when DeCastro refused to do so.

DeCastro also cites to law that recognizes the First Amendment right to film police encounters in public. *See* ECF Nos. 90 at 15; 96 at 2-4.  That general right is clearly established, subject to reasonable time, place, and manner restrictions. *See, e.g.*, *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022); *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *Glik v. Cunniffe*, 655 F.3d 78, 84-85 (1st Cir. 2011); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013).

20

However, "the clearly established standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63. Indeed, the "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted," which "requires a high degree of specificity." *Id.* (quotations omitted).  In the qualified immunity context, a "rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* (simplified).

Merely asserting a broad First Amendment right to film police activity in public is not sufficiently specific.  DeCastro has not identified a Supreme Court or Ninth Circuit case establishing that a bystander has a right to film from a particular distance, that an officer cannot tell a bystander filming a traffic stop that they must back up, how far the officer can order the person to back up, and that the officer cannot arrest a person who disobeys that directive.

DeCastro's reliance on the Ninth Circuit's decision in *Fordyce* is unavailing.  In *Fordyce*, the plaintiff was video and audio recording a public protest march. 55 F.3d at 438.  An officer asked the plaintiff if he was audio recording and warned him that Washington law criminalized recording private conversations without consent. *Id.* at 439.  The plaintiff "refused to stop videotaping two boys after an adult relative supervising them asked him to stop and complained to the police." *Id.*  The officer also asked him to stop but he refused and was arrested. *Id.*  The Ninth Circuit granted the officer qualified immunity for arresting the plaintiff because "whether and under what circumstances conversations in public streets could be deemed private within the meaning of the privacy statute was not yet settled under Washington state law," so "a reasonable officer could have believed [the plaintiff] was recording private conversations in violation of the statute." *Id.*  The Ninth Circuit did not hold that the plaintiff had an unfettered First Amendment

right to record regardless of Washington law, that the Fourth Amendment forbade the officer from asking him to stop recording, or that the officer violated the Fourth Amendment by arresting him when he refused to stop.

DeCastro also has not pointed to a robust consensus among other courts on the contours of reasonable time, place, and manner restrictions on filming the police in public.  Courts vary on how close is too close and whether the allowable proximity changes based on the context, such as a traffic stop, an arrest in a public place, or near a police checkpoint.[7]  Some cases do not involve a request from law enforcement to back up; instead the officers simply arrested the plaintiff with no instructions or warnings.[8]  Moreover, many of the cases address First Amendment retaliation claims, not Fourth Amendment seizure claims.[9]  And several involving

---

[7] *See, e.g.*, *Fields*, 862 F.3d at 356, 360-62 (finding a clearly established right to film or photograph police where one of the plaintiffs was at an unspecified but unobstructive location during a protest, and the other was across the street 15 feet away from police breaking up a house party but granting qualified immunity based on prior circuit law); *Glik*, 655 F.3d at 79-80, 82 (finding a First Amendment right to film where the plaintiff saw an arrest taking place in a traditional public forum and stopped "roughly ten feet away" to film, was not told to back up, and was arrested for unlawful recording under the state's wiretap law); *Kelly v. Borough of Carlisle*, 622 F.3d 248, 251, 262-63 (3d Cir. 2010) (holding that, when the traffic stop at issue occurred in 2007, there was no clearly established right to videotape police officers during a traffic stop and noting that traffic stops are "inherently dangerous situations" that distinguished that situation from other public filming cases (quotation omitted)).  *Cf. Jordan v. Jenkins*, 73 F.4th 1162, 1171 (10th Cir. 2023) (holding officers lacked probable cause to arrest for obstruction based on the plaintiff shouting at officers from "twenty to forty feet away . . . on a public sidewalk or street").

[8] *See, e.g.*, *Fields*, 862 F.3d at 356 (one plaintiff was pinned against a pillar without warning, which prevented her from filming, while the other plaintiff was ordered to leave but refused to do so); *Glik*, 655 F.3d at 80 (officer told the plaintiff he had taken enough pictures, asked if the plaintiff was audio recording, and then arrested him for violating a state wiretap law).

[9] *See, e.g.*, *Irizarry*, 38 F.4th at 1286, 1294-95 (finding the complaint stated a First Amendment retaliation claim under clearly established law where the officer physically blocked filming bystanders' view of a DUI stop, shined a light into their cameras, and then drove his patrol car at them); *Fields*, 862 F.3d at 356-57; 359-60 (finding a clearly established right to film or photograph police in the context of a First Amendment retaliation claim; the Fourth Amendment claim was dismissed); *Glik*, 655 F.3d at 85-89 (evaluating the Fourth Amendment claim based on whether the officers had probable cause to believe the plaintiff violated a state wiretap statute,

Fourth Amendment claims find no violation for an obstruction arrest after the officer ordered the plaintiff to back up to distances greater than ten feet.[10]  As the Fifth Circuit put it, "[t]he rub is figuring out when filming veers from documenting to interfering. . . .  How close is 'too close' such that the filming, however well-intentioned, becomes hazardous, diverting officers' attention and impeding their ability to perform their duties in fast-moving, highly charged situations?" *Buehler v. Dear*, 27 F.4th 969, 976 (5th Cir. 2022).  The lines have not been clearly drawn such that Bourque would know his actions in this case would violate the Fourth Amendment. *Hulbert v. Pope*, 70 F.4th 726, 736 (4th Cir. 2023) ("Neither this court, nor the Supreme Court, nor any other circuit has recognized an unlimited First Amendment right to film police free of otherwise reasonable limitations.  In fact, the circuits that recognized a right to film explicitly noted that it may be subject to reasonable time, place, and manner restrictions." (quotation omitted)).

---

not based on whether the plaintiff had an unfettered First Amendment right to film police activity).

[10] *See Hulbert v. Pope*, 70 F.4th 726, 733-35, 737-38 (4th Cir. 2023) (holding officer was entitled to qualified immunity on First and Fourth Amendment claims because the officer reasonably could have believed that his orders to the plaintiff, who was filming, to move off the sidewalk to move back "at most, fifteen feet" were lawful and could reasonably believe he had probable cause to arrest when the plaintiff refused); *Buehler v. Dear*, 27 F.4th 969, 977, 992 (5th Cir. 2022) (holding no Fourth Amendment violation where officers warned the plaintiff, who was filming, that he was too close by standing within a foot or two of the officers and arrested him for obstruction when he refused to back up after being ordered to do so because the officers "obviously" had probable cause); *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656-58 (5th Cir. 2004) (holding officer was entitled to qualified immunity for arresting the plaintiff for obstruction where the plaintiff was shouting at the officer from approximately 10 to 15 feet away after being told to step back during a tense and evolving situation involving an "out-of-control" individual who was "trying to fight" eight other individuals who had attacked him); *Gonzalez v. City of Newport Beach*, No. 820CV00142JLSADS, 2021 WL 6618757, at *2-3, 5-6 (C.D. Cal. Oct. 13, 2021) (holding no Fourth Amendment violation where an officer arrested the plaintiff for obstruction after the officer ordered the plaintiff, who was filming, to back up to a sidewalk about 20-25 feet away from a traffic stop and the plaintiff refused and granting qualified immunity due to a lack of clearly established law).

In sum, DeCastro has not met his burden of pointing to clearly established law that he has a right to film a traffic stop from a particular distance,[11] that any reasonable officer in Bourque's shoes would know that he could not order a bystander filming a traffic stop to back up, and that a police officer would know that it would violate the filming bystander's Fourth Amendment rights to arrest him when he refused an order to back up.  Because it is not beyond debate that Bourque violated DeCastro's Fourth Amendment rights, he is entitled to qualified immunity on DeCastro's Fourth Amendment false arrest and related unreasonable search claims.  And the other officers who assisted in the arrest and search are likewise entitled to qualified immunity, because no clearly established law would have put them on notice that the arrest and search were unlawful under the Fourth Amendment.  I therefore do not reconsider my decision granting qualified immunity to the defendants on DeCastro's federal Fourth Amendment claims.

### 3. *Discretionary Immunity for State Law Claims*

DeCastro also argues that I erred in finding that the defendants are entitled to discretionary immunity for the state law claims based on his arrest and search because decisions about the amount of force to use are not covered by discretionary immunity, nor are acts taken in violation of the Constitution or in bad faith.  The defendants respond that DeCastro relies on cases about excessive force, but I did not dismiss his excessive force claims.  And they argue that because I previously ruled that Bourque had probable cause, the officers did not act in violation of the Constitution.

---

[11] DeCastro cites to Bourque's testimony at the criminal trial that he is trained to tell citizens who want to film police activity to back up 21 feet. *See* ECF Nos. 90 at 16; 90-1 at 8-9. Although DeCastro asserts that this violates the First Amendment, he points to no clearly established law holding that it does.

I previously held that the officers were entitled to discretionary immunity on DeCastro's state law claims for false imprisonment and negligence. ECF No. 44 at 13-14. I also noted that DeCastro had not pleaded claims under the Nevada Constitution, but I granted him leave to do so, which he did in the SAC. *Id.* at 15; ECF No. 61 at 19-20.

Under Nevada law, an officer's decision to arrest generally is protected by discretionary immunity because the decision is discretionary and based on policy considerations of enforcing criminal laws. *See Gonzalez v. Las Vegas Metro. Police Dep't*, No. 61120, 2013 WL 7158415, at *2-3 (Nev. Nov. 21, 2013) (holding that an officer's decision to arrest based on a matched description in a facially valid warrant was entitled to discretionary immunity); *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007) (en banc) (holding that discretionary immunity applies if the officer's decision "(1) involve[d] an element of individual judgment or choice and (2) [was] based on considerations of social, economic, or political policy"). However, that immunity does not apply to acts done in bad faith or in violation of the Constitution. *Falline v. GNLV Corp.*, 823 P.2d 888, 891-92 (Nev. 1991); *Bruins v. Osborn*, No. 2:15-cv-00324-APG-VCF, 2016 WL 8732299, at *6 (D. Nev. Feb. 5, 2016); *see also Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960, 965 (9th Cir. 2020).

DeCastro asserts that I erred by not applying the exceptions to discretionary immunity for bad faith or unconstitutional acts. But DeCastro did not make these arguments in his opposition to the defendants' motion to dismiss. *See* ECF No. 27 at 9. Although I must liberally construe pro se filings, the filing must contain something that can be liberally construed to raise the argument. *Cf. In re 1111 Minors Co.*, 116 F.3d 485 (9th Cir. 1997) ("Although we liberally construe pro se appellate briefs, the Madans's brief is completely void of the information necessary for us to determine whether there are grounds for reversal.").

DeCastro has now made the arguments and I have reconsidered my decision that Bourque had probable cause as a matter of law. Because a reasonable jury could find that Bourque lacked probable cause or that he engaged in First Amendment retaliation (as discussed below), a reasonable jury may also find that the arrest and search incident to arrest were in bad faith or violated the Constitution. Discretionary immunity therefore does not apply. And Nevada does not recognize qualified immunity for violations of the Nevada Constitution. *See Mack v. Williams*, 522 P.3d 434, 451 (Nev. 2022) (en banc) ("[Q]ualified immunity, as that doctrine is understood under federal law, is not a defense available to state actors sued for violations of the individual rights enumerated in Nevada's Constitution.").

Consequently, I deny the defendants' motion for summary judgment as to DeCastro's seizure and search claims under the Nevada Constitution.[12] However, because I previously dismissed this claim, the parties have not adequately addressed at summary judgment which officers may be liable for the seizure and search. They also have not addressed whether LVMPD can be vicariously liable for violations of Nevada's Constitution. I therefore allow the parties to file another motion for summary judgment on these aspects of the state law unreasonable seizure and search claims.

## C. Excessive Force and Battery (Counts Three and Nine)

Count three of the SAC alleges that the officers used excessive force against DeCastro in violation of the U.S. Constitution and the Nevada Constitution, and state common law (battery).[13] The claim is based on Bourque using unnecessary force against DeCastro during the

---

[12] Article 1, § 18 of the Nevada Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause . . . ."

[13] The SAC also mentions federal and state statutory law and federal common law, but DeCastro does not identify what law he is referring to other than § 1983.

arrest and Sandoval using force against DeCastro after he was in custody. ECF No. 61 at 20-21. In count nine, DeCastro alleges that Sandoval battered him. *Id.* at 27.

The defendants argue that Bourque used reasonable force to detain DeCastro by using only "basic empty-hand tactics" despite DeCastro's resistance, and they contend that the video shows he did not strike DeCastro in the groin while conducting a routine pat down. ECF No. 86 at 11-12. They also argue that although the video shows Sandoval maintained a grip on DeCastro, he did not excessively squeeze DeCastro's arm. The defendants argue that a Nevada state law battery claim against a police officer is the same as a § 1983 excessive force claim, and because summary judgment is warranted on the Fourth Amendment excessive force claim it is likewise warranted for the battery claim. Alternatively, they seek qualified immunity because there is no clearly established law to show that these actions were excessive. The defendants also assert that DeCastro's claim that the other officers failed to intervene when excessive force was used against him fails because the underlying Fourth Amendment excessive force claim fails. Finally, they contend that even if excessive force was used, none of the other officers was in a position to prevent or stop the use of force.

DeCastro responds that a reasonable jury could find the officers used excessive force because the crimes at issue were minor, the defendants had no reason to believe he was dangerous, and he was surrounded by multiple officers while in handcuffs. He argues that he was subjected to force even when he was cooperating and detained, and the video is not sufficiently clear to rule as a matter of law that he was not subject to a blow to the groin or hard squeezing on his arm. DeCastro does not specifically respond to the defendants' arguments regarding a failure to intervene.

1    A police officer's "use of force is contrary to the Fourth Amendment if it is excessive

2  under objective standards of reasonableness." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir.

3  2003) (quotation omitted).  In determining the reasonableness of a use of force, I must balance

4  "the nature and quality of the intrusion on the individual's Fourth Amendment interests against

5  the countervailing government interests at stake." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th

6  Cir. 2003) (quotations omitted).  This entails a three-step analysis. *Id.*  First, I assess "the gravity

7  of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of

8  force inflicted." *Id.*  Second, I assess "the importance of the government interests at stake by

9  evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate

10  threat to the safety of the officers or others, and (3) whether the suspect was actively resisting

11  arrest or attempting to evade arrest by flight." *Id.*  Third, I weigh the gravity of the intrusion

12  against the government's interest. *Id.*

13    The reasonableness inquiry looks at all the relevant objective facts and circumstances that

14  confronted the arresting officers "judged from the perspective of a reasonable officer on the

15  scene, rather than with the 20/20 vision of hindsight." *Drummond ex rel. Drummond v. City of*

16  *Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (quotation omitted).  Additionally, the

17  reasonableness analysis must consider the fact that "police officers are often forced to make

18  split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

19  the amount of force that is necessary in a particular situation." *Id.*

20    Because the reasonableness balancing test "nearly always requires a jury to sift through

21  disputed factual contentions, and to draw inferences therefrom," courts should grant summary

22  judgment in excessive force cases "sparingly." *Id.* at 1056.  "This is because police misconduct

23  cases almost always turn on a jury's credibility determinations." *Id.*  However, I may decide

28

reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (internal quotation omitted).

The parties treat the claims under the Nevada Constitution and state law battery as identical to the federal claims, so I do the same. *See Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) ("The standard for common-law assault and battery by a police officer . . . mirrors the federal civil rights law standard" of reasonable force under the circumstances.). However, qualified immunity is not available for state law claims. *Mack*, 522 P.3d at 451. Consequently, any references to clearly established law relate only to the federal claims.

Viewing the facts in the light most favorable to DeCastro, a reasonable jury could find the use of force to be mild to moderate, from Bourque's handling of DeCastro prior to his arrest, Bourque's alleged strike to the groin, and Sandoval's squeezing of DeCastro's arm. Although the defendants contend that the video shows no excessive force, the video does not clearly capture the alleged groin strike such that I could rule as a matter of law that the force Bourque used was reasonable. Nor is it discernable how hard Sandoval was squeezing DeCastro's arm. A reasonable jury could find that some of Sandoval's comments suggest he was using more than de minimis force, such as when he stated that every time DeCastro moved, that created a reaction. Additionally, Sandoval applied pressure to DeCastro's shoulder once Sandoval decided to put DeCastro in the patrol car.

The government interests at stake were low. DeCastro was suspected of misdemeanors relating to his refusal to back up and resisting arrest. Before he was handcuffed, DeCastro posed some threat to the officers given his refusal to comply with commands and resistance to being

1  handcuffed.  But once he was handcuffed, he posed little threat to officer safety, particularly

2  given that he was outnumbered and surrounded by armed officers.

3         Balancing the gravity of the force used against the governmental interests at stake, no

4  reasonable jury could find Bourque (or Dingle) used excessive force from the time Bourque first

5  encountered DeCastro to the time he was placed in handcuffs.  Bourque grabbed DeCastro with

6  two hands and maneuvered him to the front of the car.  That minimal use of force was reasonable

7  in light of DeCastro refusing to comply with Bourque's orders and resisting detainment.

8  Additionally, Bourque and Dingle grabbing and holding on to DeCastro's arms to control him

9  and place him in handcuffs was also objectively reasonable because DeCastro was actively

10 resisting them and refusing to comply with orders to place his hands behind his back.  DeCastro

11 does not assert that the officers used weapons, punches, kicks, or any method other than grabbing

12 and holding on to him, which is consistent with the videos.  And the officers responded to

13 DeCastro's complaint that his left shoulder was previously injured by placing him in a set of

14 double handcuffs.  DeCastro did not thereafter complain that the double cuffs were hurting his

15 shoulder.  Even if a reasonable jury could find this low-level force to be unreasonable, DeCastro

16 has not pointed to clearly established law beyond general excessive force principles that would

17 have put the officers on notice that these techniques during detention and arrest were unlawful.  I

18 therefore grant the defendants' motion for summary judgment on the excessive force claim up to

19 the point that the officers handcuffed DeCastro.

20        However, once DeCastro was handcuffed and patted down, a reasonable jury could find a

21 gratuitous strike to the groin was unreasonable.  Likewise, a reasonable jury could find that

22 Sandoval forcefully squeezing DeCastro's arm and then applying pressure to his left shoulder

23 while he was handcuffed and surrounded by multiple armed officers was excessive.

Furthermore, Bourque and Sandoval are not entitled to qualified immunity for these alleged acts. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (holding that a reasonable officer would know that punching a non-resisting person was an unreasonable use of force). Consequently, I deny the defendants' motion for summary judgment as to DeCastro's § 1983, Nevada Constitution, and state law battery claims for excessive force against Bourque based on the groin strike and Sandoval based on the arm squeezing and shoulder pressure. And because LVMPD may be vicariously liable on the state law battery claim, I deny summary judgment for LVMPD on that claim as well.[14]

As for the other officers, they may "be held liable for failing to intercede in situations where excessive force is claimed to be employed by other officers only if they had an opportunity to intercede." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (quotation omitted). Even viewing the facts in the light most favorable to DeCastro, no reasonable jury could find that Dingle, Doolittle, Sorenson, Sandoval, or Torrey, are liable for failing to intervene in the alleged groin strike because, based on the video, no one had time to intervene to stop Bourque from a spontaneous alleged groin strike during a pat down. Indeed, Torrey, Doolittle, Sorenson, and Sandoval were not even on the scene at that point. I therefore grant summary judgment in favor of all defendants except Bourque on the groin strike.

However, a reasonable jury could find that Bourque, Dingle, Doolittle, and Sorenson had the opportunity to intervene when Sandoval was squeezing DeCastro's arm and applied pressure to his shoulder. A reasonable jury could find that each of them heard DeCastro complain about how hard Sandoval was squeezing his arm and that Sandoval was hurting his shoulder but did

---

[14] The parties have not addressed whether LVMPD can be vicariously liable on the claim under the Nevada Constitution. The parties may move for summary judgment on that issue.

1   not intervene.  However, Torrey did not arrive until after DeCastro was in the patrol car, so he

2   had no opportunity to intervene.  Consequently, I grant summary judgment in Torrey's favor on

3   the arm squeezing but deny summary judgment as to Bourque, Dingle, Doolittle, and Sorenson

4   on a failure to intervene theory.

5   **D.  Defamation (Count Four)**

6   Count four of the FAC alleges that Bourque, Sandoval, Torrey, Dingle, Sorenson, and

7   Doolittle "share[d] false police reports with third parties." ECF No. 61 at 21.  DeCastro alleges

8   that he was harmed by the reports because they resulted in him being cited and criminally

9   prosecuted. *Id.* at 22.

10   The defendants argue that the defamation claim fails as a matter of law because the police

11   reports do not contain false statements and because the reports were not published to third

12   persons in the absence of privilege.  Moreover, the defendants argue that DeCastro published his

13   own videos about the incident, so "any claim he has been 'defamed' is nonsense as he knowingly

14   provoked the incident to gain internet fame." ECF No. 86 at 22.

15   DeCastro responds that the defendants fail to identify a list of undisputed material facts

16   and instead rely on their version of disputed facts.  He also asserts that the defendants have

17   repeated false claims in their summary judgment motion by making assertions that he contends

18   are belied by the video evidence.  He does not respond to the argument that any publication of

19   false statements was privileged.

20   Under Nevada law,[15] to prove a defamation claim the plaintiff must show (1) the

21   defendant made a false and defamatory statement about the plaintiff; (2) the defendant published

22

23   _____

[15] The SAC refers to this claim being brought under the federal and Nevada constitutions, state
and federal statutory law, and state and federal common law.  At summary judgment, DeCastro

1   the false statement to a third person without a privilege to do so; (3) "fault, amounting to at least

2   negligence; and (4) actual or presumed damages." *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d

3   82, 90 (Nev. 2002) (quotation omitted).

4          I grant the defendants' motion for summary judgment on this claim because DeCastro has

5   not identified who made false statements or what statements are false.  He has not presented any

6   police reports in which the false statements were allegedly published.  He has not identified any

7   third parties to whom the false statements were published or evidence of publication to those

8   third parties, and he has not pointed to evidence that the police officers' publication was

9   unprivileged.  To the extent he contends that the false statements were republished in the

10  defendants' summary judgment motion, those statements post-date the SAC and so cannot be the

11  basis of this claim.  Moreover, statements in litigation are privileged. *Jacobs v. Adelson*, 325

12  P.3d 1282, 1285 (Nev. 2014) (en banc) (stating that the "absolute privilege for defamatory

13  statements made during the course of judicial and quasi-judicial proceedings . . . acts as a

14  complete bar to defamation claims").  I therefore grant summary judgment in favor of all the

15  defendants on this claim.

16          **E.  First Amendment Chilling and Retaliation (Counts Five and Six)**

17          Count five of the SAC alleges that the defendants "[took] actions that were intended to

18  and did chill [DeCastro's] First Amendment rights" by following him, tracking his movements,

19  defaming him, finding pretextual reasons for his arrest, blocking his camera, and arresting and

20  prosecuting him. ECF No. 61 at 22.  In count six, he alleges that the defendants arrested him

21  because he was exercising his First Amendment rights to record them and to criticize them. *Id.* at

22

23

---

has not identified any source of law for this claim beyond Nevada common law.  Regardless of
the source of law, DeCastro has presented no evidence in support of this claim.

23.  He alleges that there were similarly situated individuals in the parking lot that were not

filming the incident and who did not make their views on police known, and they were not

arrested. *Id.*  Finally, he alleges that even if Bourque had probable cause, officers typically do not

arrest in this situation and LVMPD policy provides that he should not have been arrested in these

circumstances. *Id.* at 23-24.  These claims are brought under the U.S. and Nevada

Constitutions.[16] *Id.* at 22-24.

The defendants argue that there is no claim for chilling of First Amendment rights and

that counts five and six are duplicative.  They argue that the First Amendment retaliation claim

fails because the officers had probable cause to arrest and DeCastro has not presented evidence

that similarly situated individuals not engaged in protected speech were not arrested.[17]

Alternatively, the defendants argue they are entitled to qualified immunity because there is no

clearly established law that arresting someone for refusing to obey commands to stand back from

a traffic stop and to cease resisting detainment amounts to a First Amendment violation.

DeCastro responds that the First Amendment right to film matters of public interest,

including police officers performing their duties in public, is clearly established.  He also argues

that because he had a right to film, Bourque's orders for him to back up and the subsequent

detainment and arrest violate clearly established law as well.

DeCastro does not dispute that counts five and six are duplicative in the context of this

case.  I therefore treat them as a single claim for First Amendment retaliatory arrest.

---

[16] Article I, § 9 of the Nevada Constitution provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

[17] The defendants also argued that DeCastro's First Amendment claim was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  But the defendants concede that because DeCastro's conviction was overturned, *Heck* does not bar his claim. *See* ECF No. 95 at 6.

Additionally, the parties treat the claim as one arising under federal law, but DeCastro also

asserts this claim under the Nevada Constitution.  Article I, § 9 of the Nevada Constitution

provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects

being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the

liberty of speech or of the press."  Because the parties presume that Nevada law would treat the

retaliatory arrest claim the same as under federal law, I do as well except for the issue of

qualified immunity because, as mentioned above, Nevada does not recognize qualified immunity

for violations of its constitution.  Consequently, references to clearly established law below are

directed at the federal claim only.

To establish a First Amendment retaliation claim under § 1983, "a plaintiff must prove:

(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse

action by the defendant that would chill a person of ordinary firmness from continuing to engage

in the protected activity; and (3) there was a substantial causal relationship between the

constitutionally protected activity and the adverse action." *Ballentine v. Tucker*, 28 F.4th 54, 61

(9th Cir. 2022) (quotation omitted).  As to the causation element, a plaintiff asserting a claim for

a retaliatory arrest typically must demonstrate that the arresting officer lacked probable cause

"because the presence of probable cause generally speaks to the objective reasonableness of an

arrest and suggests that the officer's animus is not what caused the arrest." *Id.* (quotation

omitted).

But even where the officer had probable cause, a plaintiff can prevail on a First

Amendment retaliation claim if he "presents objective evidence that he was arrested when

otherwise similarly situated individuals not engaged in the same sort of protected speech had not

been." *Id.* (quotation omitted).  The plaintiff also "must show that the retaliation was a

1  substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can

2  prevail only by showing that the arrest would have been initiated without respect to retaliation."

3  *Id.* at 63 (simplified).  Whether First Amendment activity was a substantial or motivating factor

4  for the arrest can be proved "with either direct or circumstantial evidence," and it is a fact

5  question "that normally should be left for trial." *Index Newspapers LLC v. United States*

6  *Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

7          DeCastro has presented evidence that he was engaged in protected First Amendment

8  activity by filming the police and making comments to Bourque. *See, e.g.*, *Fordyce*, 55 F.3d at

9  439; *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("[T]he First

10  Amendment protects a significant amount of verbal criticism and challenge directed at police

11  officers." (quotation omitted)).  DeCastro's general right to film and to hurl insults at Bourque or

12  verbally challenge Bourque's conduct were clearly established First Amendment rights. *See*

13  *Fordyce*, 55 F.3d at 439; *Duran*, 904 F.3d at 1378.

14          Arresting a person for exercising those rights would chill the First Amendment activities

15  of a person of ordinary firmness. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012).

16  That a retaliatory arrest would chill a person of ordinary firmness from exercising their free

17  speech rights is also clearly established. *Id.*

18          A reasonable jury could find there was a substantial causal relationship between the arrest

19  and DeCastro's filming and speech.  If the jury finds there was no probable cause, they may

20  conclude that the arrest was motivated by retaliatory animus rather than probable cause.

21  Although Bourque told DeCastro he could continue filming, viewing the facts in the light most

22  favorable to DeCastro, a reasonable jury could find that Bourque released the driver and turned

23  his attention to DeCastro because DeCastro was filming the incident and insulted Bourque and

verbally challenged his authority.  Additionally, three other individuals came close to and walked

through the area where DeCastro was being detained who were not filming or making

disparaging comments, and they were neither warned to move nor arrested. *See, e.g.*, *Dingle* at

11:35; *Sorenson 1631* at 4:27; Ex. H at 1:47:31, 1:47:40.  That difference in treatment may

support a finding that Bourque treated DeCastro differently because he was filming and

commenting.

Further, even if the jury determines Bourque had probable cause, a reasonable jury could

find that DeCastro's conduct was not the sort of offense that typically results in an arrest.

Bourque told DeCastro he was going to give DeCastro a ticket, but he would arrest DeCastro if

DeCastro did not put his hands behind his back.  A jury could infer from this comment that

misdemeanor obstruction like that at issue here is the type of offense for which officers typically

exercise their discretion not to make an arrest.  And, as mentioned, three individuals came close

to and walked through the area where DeCastro was being detained who were not filming or

making disparaging comments, and they were neither warned to move nor arrested.  That is

objective evidence from which a jury could draw the conclusion that officers typically do not

arrest members of the public for getting too close to a stop unless they are also filming or

insulting the officers.  While a jury could reach the opposite conclusion that none of those

individuals was interfering with police business the same way or under the same circumstances

DeCastro was, that is a matter for the fact finder.  Finally, the right to be free from an arrest

based on First Amendment retaliation even where the officer had probable cause was clearly

established at the time of this incident. *See Nieves v. Bartlett*, 587 U.S. 391, 404-07 (2019);

*Sanderlin v. Dwyer*, --- F.4th ----, 2024 WL 4033065, at *4 (9th Cir. Sept. 4, 2024) (stating that

1  before May 2020, it was "clearly established that police officers may not use their authority to

2  retaliate against individuals for protected speech.").

3        In sum, genuine issues of fact remain on DeCastro's First Amendment retaliatory arrest

4  claim under state and federal law.  Additionally, Bourque is not entitled to qualified immunity on

5  the federal claim and there is no qualified immunity for the state claim.  I therefore deny

6  Bourque's motion for summary judgment.

7        Further, I deny summary judgment for Torrey because he was a supervisor, he arrived on

8  the scene before DeCastro was taken to jail, and he told DeCastro that he had reviewed the BWC

9  video.  A reasonable jury thus could find that Torrey knew of and failed to prevent Bourque's

10  retaliatory arrest when he had the authority to do so, and Torrey told DeCastro he "should be

11  arrested to discourage his behavior." ECF No. 61 at 15;[18] *see Vazquez v. Cnty. of Kern*, 949 F.3d

12  1153, 1166 (9th Cir. 2020).  Consequently, Torrey also is not entitled to summary judgment.

13        As for the other officers, none was present when the incident began.  Thus, they had no

14  opportunity to intervene to stop a retaliatory arrest.  The only information they had about

15  DeCastro's behavior before they arrived was from Bourque that DeCastro was obstructive, so

16  they had no basis to conclude the arrest was retaliatory.  There is no evidence that they reviewed

17  the BWC video, nor is there that evidence they are supervisors who could have countermanded

18  Bourque's decision to arrest.  As a result, I grant summary judgment in favor of Dingle,

19  Doolittle, Sorenson, and Sandoval on the First Amendment claims.[19]

20

21  [18] The defendants argue that DeCastro cannot rely on the SAC's allegations at the summary judgment stage.  However, DeCastro signed the SAC under penalty of perjury. ECF No. 61 at 33-34.  Further, at summary judgment, I do not focus "on the admissibility of the evidence's

22  form." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  Rather, I "focus on the admissibility of its contents." *Id.*  Presumably, DeCastro would testify similarly at trial.

23  [19] Like the other state constitutional claims, the parties have not addressed whether LVMPD can be vicariously liable.  The parties may move for summary judgment addressing this issue.

### F. Entity Liability (Counts Seven and Fifteen)

Count seven alleges that the officers' acts and omissions were taken pursuant to LVMPD's[20] policies, customs, or practices:

a. To carry out or tolerate unlawful arrests without probable cause;

b. To carry out or tolerate detentions and arrests based on citizens' exercise of their First Amendment right to criticize and verbally protest officers' actions;

c. To use or tolerate excessive force;

d. To carry out or tolerate unlawful searches of persons and properties;

e. To carry out or tolerate discriminatory and biased policing and/or racial profiling;

f. To carry out or tolerate unlawful seizures of property;

g. To allow officers to file false police reports.

ECF No. 61 at 25. Count fifteen alleges that LVMPD failed to properly hire, train, and supervise its officers. *Id.* at 32. These claims are brought under state and federal law.[21] *Id.* at 24.

The defendants argue that DeCastro has not identified a policy that caused the alleged violation and that other counts in the SAC identify LVMPD policies that protect constitutional rights when enforced. They also contend that DeCastro can present no evidence of an express policy, an unwritten policy or practice, or a constitutional injury caused by a final policymaker, or that anyone acted with deliberate indifference.

---

[20] Count seven also alleges these were Torrey's policies. ECF No. 61 at 25. Count fifteen alleges that Torrey failed to train the other officers. *Id.* at 32. However, DeCastro presents no evidence that Torrey is a final policymaker for LVMPD or that Torrey trained, or was in a position to train, the other officers. I address Torrey's liability as a supervisor separately in this order.

[21] To the extent these claims are meant to address LVMPD's vicarious liability on state law torts, I address that separately in the individual state law tort claims.

DeCastro responds that Bourque testified at the criminal trial that LVMPD trained him that he could prevent filming anywhere within 21 feet of him performing his official duties. DeCastro argues that this shows that LVMPD trains its officers to violate the First Amendment by interfering with citizens observing or filming officers within 21 feet even if there is no perceived threat from the citizen. He argues that for these same reasons, the subsequent orders, detainment, uses of force, and arrest also violate clearly established law.

I previously set out the law on entity liability. ECF No. 44 at 10-12. I incorporate that law here. DeCastro has not pointed to any evidence of an LVMPD policy or custom of carrying out or tolerating unlawful arrests without probable cause, use of excessive force, unlawful searches, discriminatory policing, or filing false police reports. To the extent he relies on multiple officers in this case allegedly engaging in these activities, this single incident is insufficient to show "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 884 (9th Cir. 2022) (quotation omitted). I therefore grant summary judgment in LVMPD's favor on these allegations.

DeCastro has presented evidence from which a reasonable jury could find that LVMPD trains its officers that they can establish a perimeter of up to 21 feet from a traffic stop. Bourque testified at DeCastro's criminal trial that he was trained that he was "allowed a reasonable distance" to conduct lawful police activity such as a traffic stop. ECF No. 90-1 at 9. Bourque testified that he was trained that he could impose a 21-foot perimeter during a traffic stop so long as there were no other barriers between him and the observing citizen. *Id.* He testified that this was "taught to us in the academy," and was "based on . . . normal human reaction time to a threat." *Id.* A reasonable jury could find this training led Bourque to conclude he could order

DeCastro to back up 21 feet from the traffic stop, thus precipitating the confrontation between Bourque and DeCastro regarding how close DeCastro could be from the stop, which ultimately led to DeCastro's arrest for disobeying Bourque's orders to back up.

However, DeCastro has not pointed to facts available to LVMPD that put it on actual or constructive notice that this training "reflects deliberate indifference" to the public's constitutional rights because the law is unsettled regarding from what distance citizens have the right to observe or film a police officer conducting a traffic stop. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc) (stating that a policy is deliberately indifferent if it is "substantially certain to result in the violation of the constitutional rights of . . . citizens" (quotation omitted)). Because it is not clear that bystanders have an unfettered constitutional right to be within 21 feet of a traffic stop, a reasonable jury could not find that LVMPD was deliberately indifferent in training its officers that they could impose a 21-foot perimeter. This is not a ruling that LVMPD is entitled to qualified immunity because qualified immunity does not apply to entities. *See Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993) (stating that "municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983"). Rather, the lack of clearly established law on how close is too close means that no reasonable jury could find that LVMPD had "facts available" to it to put it "on actual or constructive notice" that its training was "substantially certain to result in the violation of the constitutional rights" by training its officers that they could order bystanders to back up 21 feet. *Castro*, 833 F.3d at 1076 (emphasis omitted). I therefore grant the defendants' summary judgment motion on the entity liability claim.

////

////

### G.  Selective Enforcement (Count 8)

Count eight of the SAC alleges that the "defendants selectively enforced laws against people with white lips, against people with brown skin, against people that expressed criticism towards law enforcement, against those recording police interactions, and against those publicizing information on Police misconduct." ECF No. 61 at 26.  DeCastro alleges that similarly situated individuals were not arrested, and that he was arrested despite LVMPD policy stating that he should not be arrested under these circumstances. *Id.*

The defendants argue that this claim fails because there is no evidence to support his allegations of differential treatment based on his skin or lip color, his criticisms of police, or recording police.  They also contend that DeCastro cannot present evidence to show that similarly situated individuals not within these groups were not arrested.  The defendants contend that the video shows that the officers told DeCastro numerous times that they had no problem with him filming, but it was his interference in the traffic stop and refusal to obey lawful orders that resulted in his arrest.  Alternatively, the defendants argue they are entitled to qualified immunity because there is no clearly established law that arresting someone for refusing to obey commands to stand back from a traffic stop and to cease resisting detainment amounts to a Fourth Amendment violation.  DeCastro does not specifically respond to these arguments beyond the arguments he makes with respect to his other claims.

"Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotation omitted).  A selective enforcement claim can be based on "a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police." *Lacey*, 693 F.3d at 920. "To prevail on an equal protection claim under the Fourteenth Amendment, a plaintiff must

demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." *Id.* (quotation omitted).  To prove a discriminatory effect, the plaintiff "must show that similarly situated individuals . . . were not" subject to the enforcement action. *Id.* (quotation omitted).  To establish a discriminatory purpose, the plaintiff must show that the defendant "decided to enforce the law against him on the basis of an impermissible ground such as race, religion or exercise of . . . constitutional rights." *Id.* (quotation omitted).[22]

DeCastro has not pointed to evidence from which a reasonable jury could find that the officers acted with a discriminatory purpose against people "with white lips" or "with brown skin."  Nothing in the interactions between DeCastro and the officers suggests a discriminatory motive based on the color of DeCastro's skin.  And while the officers commented on DeCastro's lips, they expressed the opinion that his lip color might be a sign that he was on a narcotic, and not as some immutable characteristic that suggested a discriminatory purpose against persons with white lips.  Moreover, DeCastro has not pointed to clearly established law that white or chapped lips is a category protected by the Equal Protection Clause.  I therefore grant the defendants' motion for summary judgment on these aspects of DeCastro's equal protection selective enforcement claim as to all defendants.

However, as discussed above, DeCastro has pointed to evidence that he was treated differently than similarly situated individuals because he spewed venom at Bourque and filmed the traffic stop.  Genuine disputes remain regarding whether he was selectively arrested based on his exercise of First Amendment rights.  The right against selective enforcement based on the

---

[22] "Article 4, Section 21 of the Nevada Constitution requires that all laws be "general and of uniform operation throughout the State.  The standard for testing the validity of legislation under the equal protection clause of the state constitution is the same as the federal standard." *In re Candelaria*, 245 P.3d 518, 523 (Nev. 2010).

1  exercise of constitutional rights was clearly established, so the defendants are not entitled to

2  qualified immunity. *Id.*  However, like the First Amendment claim, this claim proceeds only

3  against Bourque and Torrey, because the other officers were not present when the incident

4  began, had no opportunity to intervene on this basis, and are not supervisors who reviewed the

5  BWC video and could have ordered Bourque not to complete the arrest.  As a result, I grant

6  summary judgment in favor of Dingle, Doolittle, Sorenson, and Sandoval on this claim.[23]

7  **I. Negligence (Count 11)**

8  The SAC alleges that the defendants had duties to "carefully investigate any criminal

9  activity," and to avoid subjecting DeCastro to an illegal detention, arrest, seizure, retaliation, or

10  selective enforcement based on race or the exercise of First Amendment rights. ECF No. 61 at

11  28-29.  The defendants argue that DeCastro's negligence claim is limited to a theory of excessive

12  force because I previously dismissed the other aspects of the negligence claim, and that claim

13  fails because a negligence claim cannot be based on the officers' intentional acts of using force.

14  Alternatively, they argue that DeCastro lacks evidence that the officers breached a duty of care

15  that caused him damages.  DeCastro responds that the defendants fail to identify a list of

16  undisputed material facts and instead rely on their version of disputed facts, but he does not

17  specifically respond to these arguments.  In particular, he does not dispute that his negligence

18  claim is limited to excessive force, nor does he dispute that a negligence claim cannot proceed

19  based on the use of excessive force.

20  The Supreme Court of Nevada has not expressly addressed the issue of whether a police

21  officer can be liable under a negligence theory based on the same facts as battery, excessive

22  

23  _____

[23] As with the other constitutional claims, the parties have not addressed whether LVMPD can be vicariously liable for constitutional torts under Nevada law.  They parties may move for summary judgment on this issue.

force, or other intentional tort claims.  However, that court has stated that negligence "is an unintentional tort, a failure to exercise the degree of care in a given situation that a reasonable man under similar circumstances would exercise to protect others from harm." *Rocky Mountain Produce Trucking Co. v. Johnson*, 369 P.2d 198, 201 (Nev. 1962) (quotation omitted).  The Supreme Court of Nevada explained that a "negligent person has no desire to cause the harm that results from his carelessness, and "he must be distinguished from a person guilty of willful misconduct, such as assault and battery, who intends to cause harm." *Id.* (citing Restatement of Torts § 282(c)).  The Supreme Court of Nevada also stated that "[i]f conduct is negligent, it is not willful; if it is willful, it is not negligent." *Id.*; *see also Kuchta v. Sheltie Opco, LLC*, No. 76566-COA, 466 P.3d 543, 2020 WL 3868434, at *4-6 (Nev. Ct. App. July 8, 2020) (distinguishing between unintentional and intentional conduct for negligence and battery claims).

By specifically distinguishing battery from negligence, the Supreme Court of Nevada has suggested that battery and excessive force claims cannot also be the basis of a negligence claim where the facts support only intentional or willful conduct.  Thus, I predict[24] that the Supreme Court of Nevada would agree with the Supreme Court of Arizona that "negligence and intent are mutually exclusive grounds for liability," and there is no cognizable claim for the "negligent use of intentionally inflicted force." *Ryan v. Napier*, 425 P.3d 230, 236 (Ariz. 2018); *see also Wells v. City of Las Vegas*, No. 2:21-CV-1346 JCM (EJY), 2024 WL 2028007, at *16 (D. Nev. May 7, 2024) (predicting that the Supreme Court of Nevada would hold that police officers cannot be held liable under a negligence theory for alleged use of excessive force).  However, a plaintiff

---

[24] "Where the state's highest court has not squarely addressed an issue, [I] must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Judd v. Weinstein*, 967 F.3d 952, 955–56 (9th Cir. 2020) (quotation omitted).

1  "may plead a negligence claim for conduct that is independent of the intentional use of force or

2  plead negligence and battery as alternate theories if the evidence supports each theory." *Ryan*,

3  425 P.3d at 238.

4  Because DeCastro did not respond to this portion of the defendants' motion, he has not

5  identified facts that would support a negligence theory.  He does not identify facts to support a

6  negligence claim based on something other than the officers using force, and he does not suggest

7  that any use of force was negligent, such as an officer unintentionally striking DeCastro. *See id.*

8  (suggesting that if a jury could find a police dog handler unintentionally dropped the dog's leash

9  and the dog attacked the plaintiff, that could support a negligence theory).  Rather, he contends

10  Bourque intentionally grabbed him and struck him in the groin, and Sandoval intentionally

11  squeezed his arm and put pressure on his shoulder.  Additionally, he alleges intentional

12  retaliation and selective enforcement.  Because no reasonable jury could find the officers were

13  negligent under the facts of this case, I grant the defendants' motion for summary judgment on

14  the negligence claim.

15  **K.  Civil Conspiracy (Count 13)**

16  Count 13 of the SAC alleges the defendants agreed to violate DeCastro's civil rights,

17  defame him, and batter him. ECF No. 61 at 30.  The SAC alleges this claim is brought under the

18  U.S. and Nevada constitutions, and federal and state statutory and common law. *Id.*

19  The defendants characterize this claim as arising only under Nevada state law.  They

20  argue the claim fails because there is no evidence of a conspiracy or that the officers acted with

21  the purpose to harm him.  Alternatively, they argue that they cannot conspire with each other

22  under the intracorporate conspiracy doctrine because they are LVMPD employees acting as

23  officers and not acting for their individual advantage.  DeCastro responds that the defendants fail

1  to identify a list of undisputed material facts and instead rely on their version of disputed facts.

2  DeCastro does not specifically respond to the argument that the defendants cannot conspire as a

3  matter of law under the intracorporate conspiracy doctrine.

4      Under Nevada law, "an actionable civil conspiracy is a combination of two or more

5  persons who, by some concerted action, intend to accomplish some unlawful objective for the

6  purpose of harming another which results in damage." *Collins v. Union Fed. Sav. & Loan Ass'n*,

7  662 P.2d 610, 622 (Nev. 1983).  However, "[a]gents and employees of a corporation cannot

8  conspire with their corporate principal or employer where they act in their official capacities on

9  behalf of the corporation and not as individuals for their individual advantage." *Id.*  The Supreme

10 Court of Nevada has applied this "intracorporate conspiracy doctrine" to agents and employees

11 of a city "who were acting in their official capacity when they committed the torts alleged." *See*

12 *City of Las Vegas v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, No. 86623, 550 P.3d 812, 2024

13 WL 3170683, at *2 (Nev. 2024).  It is unsettled whether the intracorporate conspiracy doctrine

14 applies to claims under § 1983 or § 1985. *See Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017); *Lobato*

15 *v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *2 (9th Cir. Oct. 11,

16 2023) (granting qualified immunity because the plaintiff pointed to no clearly established law

17 that the intracorporate immunity doctrine did not apply to a § 1983 conspiracy claim).[25]

18     Because DeCastro did not respond to this portion of the defendants' motion, he did not

19 dispute that he is pursuing this claim only under Nevada law.  He did not point to evidence that

20 the defendants were not acting in their official capacity as LVMPD officers or that they were

21 otherwise acting for their individual advantage.  Additionally, DeCastro does not point to any

22

23 _____

[25] The defendants did not address qualified immunity because they characterized this claim as
one arising under state law.

47

1 evidence supporting the elements of this claim generally.  The incident is captured on video and

2 there is no evidence from which a reasonable jury could find that the officers agreed to violate

3 DeCastro's rights, defame him, or batter him.  And he does not argue or point to any law that the

4 intracorporate conspiracy doctrine does not apply under federal law.  Accordingly, the officers

5 are entitled to summary judgment on this claim under both state and federal law.  I therefore

6 grant the defendants' motion for summary judgment on the civil conspiracy claim.

7 **L.  Abuse of Process (Count 14)**

8 Count 14 of the SAC alleges that the defendants "initiated process to achieve an unlawful

9 purpose" and thereby denied DeCastro due process.  ECF No. 61 at 31.  The SAC alleges this

10 claim is brought under the U.S. and Nevada constitutions, and federal and state statutory and

11 common law. *Id.*

12 The defendants characterize this claim as one arising under Nevada law stemming from

13 DeCastro's arrest and criminal charges.  They contend that the filing of a criminal complaint

14 cannot support this claim.  The defendants argue there is no evidence that after the criminal

15 complaint was filed, these defendants used the legal process for a purpose other than in the

16 regular course of proceedings.  DeCastro responds that the defendants fail to identify a list of

17 undisputed material facts and instead rely on their version of disputed facts.  He does not

18 specifically respond to the defendants' argument that filing a criminal complaint cannot

19 constitute abuse of process.

20 Under Nevada law, "[t]o support an abuse of process claim, a claimant must show (1) an

21 ulterior purpose by the party abusing the process other than resolving a legal dispute, and (2) a

22 willful act in the use of the legal process not proper in the regular conduct of the proceeding."

23 *Land Baron Inv. v. Bonnie Springs Fam. LP*, 356 P.3d 511, 519 (Nev. 2015) (simplified).

"[F]iling a complaint does not constitute abuse of process," because filing a complaint is not "a willful act that would not be proper in the regular conduct of the proceeding." *Id.* (simplified).

Because DeCastro did not respond to this portion of the motion, he does not dispute that he is pursuing this claim only under Nevada law.  He also has not pointed to any evidence to support this claim.  To the extent it is based on Bourque filing a criminal complaint against him, that does not constitute abuse of process.  I therefore grant summary judgment in the defendants' favor on this claim.

**M.  Sealing**

Dingle's BWC video provided to the court shows the names and personal identifiers of individuals who are not parties to this case that were written in Dingle's notebook.  There may be other violations of Local Rule IC 6-1 in the videos.  I therefore order them sealed.  The defendants must comply with Local Rule IC 6-1 and provide to the court redacted versions of the videos for public availability by September 27, 2024.

**IV.  CONCLUSION**

I THEREFORE ORDER that the defendants' motion for summary judgment **(ECF No. 86) is GRANTED in part** as follows:

- I grant summary judgment in favor of all defendants on DeCastro's federal Fourth Amendment claims.

- I deny summary judgment on DeCastro's state law seizure and search claims, subject to potential additional summary judgment motion practice.

- I grant summary judgment in favor of all defendants on DeCastro's federal and state excessive force claims up to the moment of handcuffing.

I deny summary judgment on DeCastro's state and federal excessive force claims against Bourque based on the alleged groin strike.  I grant summary judgment to Torrey, Dingle, Doolittle, Sandoval, and Sorenson on the alleged groin strike.  Whether LVMPD is vicariously liable for Bourque's actions is subject to potential additional summary judgment motion practice.

I deny summary judgment on DeCastro's state and federal excessive force claims against Sandoval, Bourque, Doolittle, Dingle, and Sorenson based on the alleged arm squeezing and shoulder pressure.  Whether LVMPD is vicariously liable for the officers' actions is subject to potential additional summary judgment motion practice.

I grant summary judgment on DeCastro's state and federal excessive force claims against Torrey.

I grant summary judgment in favor of all defendants on the defamation claim.

I deny summary judgment on DeCastro's state and federal First Amendment claims against Bourque and Torrey.  I grant summary judgment in favor of Doolittle, Sorenson, Sandoval, and Dingle on these claims.  Whether LVMPD is vicariously liable for the officers' actions is subject to potential additional summary judgment motion practice.

I grant summary judgment in favor of LVMPD on the entity liability claim.

I grant summary judgment in favor of all defendants on DeCastro's selective enforcement claim based on the color of DeCastro's skin or lips.  I deny summary judgment on the selective enforcement claim against Bourque and Torrey.  Whether LVMPD is vicariously liable for Bourque and Torrey's actions is subject to potential additional summary judgment motion practice.

I grant summary judgment in favor of all defendants on DeCastro's claims for negligence, civil conspiracy, and abuse of process.

1    I FURTHER ORDER that plaintiff Jose DeCastro's motion for reconsideration **(ECF No.**

2 **64) is GRANTED in part** as set forth in this order.

3    I FURTHER ORDER that the manually filed video exhibits filed by the defendants **(ECF**

4 **Nos. 67; 81; 87) are SEALED** because they contain personal identifiers of nonparties.

5    I FURTHER ORDER that the defendants shall file redacted versions of the video exhibits

6 that remove all personal identifiers by September 27, 2024.

7    I FURTHER ORDER that the deadline to file a motion for summary judgment is October

8 4, 2024.  The motion may address only the identified issues relating to the state law unreasonable

9 arrest and seizure claims, the invasion of privacy claim, and LVMPD's vicarious liability on

10 state constitutional claims.  If any party files a motion, the deadline for filing the proposed joint

11 pretrial order is extended to 30 days after I rule on any such motion.  If no party files a motion,

12 then the proposed joint pretrial order is due October 31, 2024.

13    DATED THIS 12th day of September, 2024.

14
_____
ANDREW P. GORDON
15
UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23